**William A. HOLBROOK, Plaintiff,**

v.

**CITY OF ALPHARETTA, GEORGIA, Mayor Jimmy Phillips, Individually, and in His Official Capacity as Mayor, Billy Hunter, Individually, and in His Official Capacity as Councilman, Sandra B. Johnson, Individually, and in Her Individual Capacity as Councilwoman, Bill Keeton, Individually, and in His Official Capacity as Councilman, Arthur Letchas, Individually, and in His Official Capacity as Councilman, Earl Mitchell, Individually, and in His Official Capacity as Councilman, Sergeant Jim Mulvihill, Individually, and in His Official Capacity as Sergeant in the City of Alpharetta Police Department, and Chief E.L. Waters, Individually, and in His Official Capacity as Police Chief of the City of Alpharetta Police Department, and Gordon Dillon, Individually, and in His Official Capacity as Police Chief of the City of Alpharetta Police Department, Defendants.**

Civil No. 1:92–CV–252–JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 31, 1995.

David C. Ates, Kirwan, Parks, Chesin & Remar, Atlanta, GA, Steven Keith Leibel, Steven K. Leibel & Assoc., Atlanta, GA, for Plaintiff.

Beverly Holland Pritchard, Benton J. Mathis, Jr., Drew, Eckl & Farnham, Atlanta, GA, Lori V. Winkleman, Office of State Atty. General, Atlanta, GA, Charles S. Thomas, Bovis, Kyle & Burch, Atlanta, GA, for Defendant.

## ORDER

CARNES, District Judge.

This case is presently before the Court on Defendants' Motion for Summary Judgment regarding plaintiff's claims of violation of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 ("ADA"),[1] Section 504 of the Rehabilitation Act of 1973,[1] 29 U.S.C. § 794 ("Section 504"), and 42 U.S.C. § 1983. Specifically, plaintiff claims that defendants violated these statutes by refusing to assign cases to plaintiff, by failing to provide reasonable accommodations to plaintiff, by failing to promote plaintiff to a sergeant position and by constructively discharging plaintiff. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, grants Defendants' Motion for Summary Judgment.

## I. Procedural background

This case has a long and complicated procedural background. Initially, plaintiff filed a complaint in which he claimed violations of Title II of the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act, the Georgia Equal Employment for the Handicapped Act, and 42 U.S.C. § 1983. On March 29, 1993, this Court granted summary judgment for defendants on (1) plaintiff's Title II ADA claims; (2) plaintiff's claim under the Georgia Equal Employment for the Handicapped Act; and (3) plaintiff's 42 U.S.C. § 1983 claim for retaliation against him in violation of his First Amendment rights for filing the *ante litem* notice against the city. At that time, this Court denied summary judgment on plaintiff's Section 504 claim.

Plaintiff then moved to amend his complaint, which motion was granted as unopposed on July 20, 1993. Plaintiff's amended complaint consists of the following claims:

(1) refusal to assign plaintiff cases in violation of Title I of the ADA and Section 504; (2) failure to provide reasonable accommodations in violation of Title I of the ADA and Section 504; (3) constructive discharge in violation of the ADA and Section 504; (4) a violation of 42 U.S.C. § 1983 as a result of defendants' alleged violation of the ADA and Section 504; (5) a state law claim of intentional infliction of emotional distress; and (6) a state law claim of negligent supervision. (Amended Complaint [50] at 16–23). Defendants then moved for summary judgment on all of plaintiff's claims.

In its Order of September 30, 1994, this Court granted summary judgment for defendants in their individual capacities on the 42 U.S.C. § 1983 claim, as well as both state law claims. The Court concluded that it would reconsider its prior holding regarding the Section 504 claim and granted defendants' request for oral argument concerning all claims of violation of Section 504 and Title I of the ADA. On October 26, 1994, oral argument was held. Subsequent to that oral argument, both parties have submitted briefs and defendants have renewed their motion for summary judgment on all remaining claims. The claims before the Court at this time are as follows:

(1) failure to promote plaintiff in violation of Section 504;

(2) refusal to assign plaintiff cases in violation of Title I of the ADA and Section 504;

(3) failure to provide reasonable accommodations in violation of Title I of the ADA and Section 504;[2] and

(4) constructive discharge in violation of the ADA and Section 504

(5) violation of 42 U.S.C. § 1983 by defendants in their official capacities.

---

1. The Rehabilitation Act is referred to by courts in many ways. For example, it may be referred to as Section 504, or 29 U.S.C. § 794, or the Rehab Act, or the Vocational Rehabilitation Act. The act is officially titled "Vocational Rehabilitation and Other Rehabilitation Services" and begins at 29 U.S.C. § 701.

2. Originally, plaintiff argued that defendants failed to permit him to use his Aimpoint 3000 scope on his weapon as a reasonable accommodation. Plaintiff, however, has qualified with his weapon without the use of his scope. *See* discussion *infra* regarding Aimpoint 3000 scope. During oral argument, plaintiff's counsel stated that the issue of the use of the scope as a reasonable accommodation is "irrelevant" since the plaintiff qualified on the Standard Georgia Double Action Pistol Range Test and is able to carry a weapon. (Hr'g Tr. Oct. 26, 1994, at 28.)

The Court notes that Title I of the ADA did not become effective until July 26, 1992. 42 U.S.C. § 12112, Historical and Statutory Notes. Therefore, any allegedly discriminatory action occurring before July 26, 1992 will violate only Section 504 of the Rehabilitation Act and not Title I of the ADA.

## II. Factual background

As this is a motion for summary judgment by the defendants, this Court is required to view the facts in the light most favorable to the non-moving party, in this case, plaintiff. Accordingly, the majority of the factual background comes directly from plaintiff's depositions, affidavits and statements of material facts.

### A. Plaintiff's medical condition

Plaintiff William Holbrook was employed as a detective with the Alpharetta Police Department. In 1987 while on his way to work, plaintiff was involved in an accident that left him with a severe visual impairment. (Pl.Statement of Mat.Facts [64] at Ex. B. Aff. of William Holbrook ¶ 3.) Plaintiff was hospitalized for at least a month and possibly a month and a half. (Dep. of Holbrook, June 4, 1992, at 38 (hereinafter "Dep. of Holbrook I").) Plaintiff was unable to work for ten months. (*Id.* at 43.) During the entire period, plaintiff received his full salary and benefits from the City of Alpharetta. (*Id.* at 41.) A workers' compensation claim was filed and plaintiff received salary benefits from workers' compensation that he turned over to the City of Alpharetta. (*Id.*) Plaintiff's medical bills exceeded $97,000.00 and he did not have to pay any of these medical bills. (*Id.* at 40–42.)

After the accident, plaintiff developed diabetic retinopathy. (Dep. of Ralph C. DiIorio, M.D., at 12.) "[D]iabetic retinopathy is a condition where the blood vessels of the retina are affected by an underlying diabetic condition." (*Id.*) The retinal blood vessels undergo changes which can range from minor changes such as dot hemorrhages,[3] to severe changes such as the formation of new blood vessels where blood vessels normally do not exist. (*Id.*) These new blood vessels can cause multiple bleeding episodes, multiple scarring episodes inside the retina and ultimately can cause the retina to detach. In plaintiff's case, the retinas in both of his eyes detached and he had to undergo surgery to reattach the retinas. (Dep. of Holbrook I, at 44.)

Dr. DiIorio, who examined plaintiff during the course of this litigation, stated that plaintiff's right eye has a "catastrophic loss of vision" and the left eye has "very severe damage from diabetic retinopathy." (Dep. of DiIorio, at 13.) As part of his examination, Dr. DiIorio measured the confrontation fields, or visual fields, in plaintiff's eyes. This examination is done by having the patient look directly at the doctor. The doctor then holds his hand up at various spots in the peripheral visual field to see if the patient can count the fingers that are up and identify where they are. (*Id.* at 19.) The doctor marks the results of this examination on the chart under "Confrontation Fields." (*Id.* at Ex. 3.) Under the heading "Confrontation Fields" are two circles, one for each eye. When completing the chart, the doctor marks off the part of the field which is absent. (*Id.* at 19.) In plaintiff's case, Dr. DiIorio described the chart as indicating that in the "right eye [the visual field] was totally absent as one might expect because he sees nothing out of the right eye." (*Id.* at 19–20.) Regarding the left eye, Dr. DiIorio described the chart as indicating that the left eye field is "severely restricted and [the] central area here remains." (Dep. of DiIorio, at 20.) Essentially, the picture of the left eye on the chart looks like a donut. (*Id.* at Ex. 3.) The "hole" of the donut is the range of vision remaining in plaintiff's left eye.

Additionally, in his left eye, plaintiff has an additional "fairly large hole" in his iris. (*Id.* at 24–25.) The iris is the colored part of the eye. The iris normally has one hole in it which is called the pupil. (*Id.* at 24.) Plaintiff's additional hole in his iris was made to access the inside of his eye during prior surgery. (*Id.*) Dr. DiIorio opined that having two holes in an iris can cause glare and a "double vision type of sensation." (Dep. of DiIorio, at 24.) Dr. DiIorio did not, however,

---

**3.** Dot hemorrhages are little, small hot hemor- rhages on the retina. (Dep. of DiIorio, at 12.)

make any determination as to whether plaintiff suffered from either glare or double vision. (*Id.* at 25.)

When wearing his contact lens, plaintiff's vision in his left eye is either 20/70 or 20/50. Dr. DiIorio measured his vision as 20/70. (*Id.* at Ex. 2.) In his deposition, plaintiff states his vision is 20/50. (Dep. of Holbrook I, at 39–40.) Plaintiff also has no depth perception because he sees out of only one eye. (Dep. of DiIorio, at 30.)

## B. The Alpharetta Police Department

The City of Alpharetta Police Department has approximately twenty-eight officers. (Dep. of Holbrook I, at 137.) Since plaintiff's return to work after the accident, the police department has assigned as many as five officers, including supervisors, to the detective division. (*Id.* at 155.) Usually, however, three officers are assigned to the detective division, one detective sergeant and two detectives. (*Id.* at 134.) Because the detective division is so small, the detectives in the detective division do not specialize in certain types of crime, but are required to investigate any type of crime that needs investigating. (*Id.* at 238.)

Since plaintiff's accident, the police department has had three different chiefs. When plaintiff returned to work following his accident, Chief Abernathy was the chief. In 1991, Chief Abernathy was replaced by Chief Waters. In 1992, Chief Waters was replaced by Chief Dillon.

## C. Plaintiff's return to work

After the accident, the Alpharetta Police Department permitted plaintiff to return to work. Prior to the accident, plaintiff was a narcotics detective. After the accident, plaintiff was unable to drive and therefore was assigned to the detective division as a detective only. (Dep. of Holbrook I, at 50.) His duties were mainly office work and he handled cases which could be handled by telephone or within the office, such as domestic cases. (*Id.* at 50–51, 65.) Plaintiff states that he did not have a problem with the limited duties at that time. (*Id.* at 55.)

When plaintiff first returned to work following his accident, he was assigned a partner, Detective Garren, for approximately a year. (*Id.* at 133.) No other detective in the detective division had an assigned partner. (Dep. of Holbrook I, at 133–34.)

Plaintiff has not driven since his accident. When plaintiff first returned to work, he still had a Georgia Driver's License; however, he did not drive because his vision problem precluded him from driving. (*Id.* at 58.) Currently, plaintiff does not have a Georgia Driver's License and has not applied for a new license. (Dep. of Holbrook, August 12, 1993, at 14 (hereinafter "Dep. of Holbrook II").) On June 4, 1992, plaintiff stated that he was reluctant to obtain a driver's license, not only because of his vision, but also because "I would be scared if I would hit someone or someone would hit me." (Dep. of Holbrook I, at 125.) On August 12, 1993, however, plaintiff stated that, if his visual acuity were ever improved enough to obtain a driver's license, he would try to apply for a new license. (Dep. of Holbrook II, at 14.)

After plaintiff had been working for a while, his physician, Dr. Donnelly, wrote a letter to the City of Alpharetta stating that plaintiff could perform duties other than desk duties. (*Id.*) Plaintiff was then gradually given assignments which required that he go out of the office. (Dep. of Holbrook I, at 57–58.) Because plaintiff could not drive, however, another detective was always required to leave his duties and transport plaintiff whenever the latter had an assignment outside the office. (*Id.*)

In addition to providing transportation for plaintiff whenever he left the office to perform tasks for the detective division, on-duty employees also assisted plaintiff in getting to and from work. (Dep. of Holbrook I, at 59.) An officer or other on-duty police department employee would come and pick plaintiff up to take him to work and also take him home from work. (*Id.*) At other times, plaintiff would provide his own transportation. (*Id.*)

After the accident and during the period when plaintiff was investigating cases outside the office, generally he would investigate crime scenes with another detective, but occasionally, he went to crime scenes by him-

self. (*Id.* at 78–79.) For example, he went to natural deaths by himself. (*Id.* at 81.)

In November of 1991, the police department hired Sergeant Mulvihill as the supervisor for the detective division. Plaintiff states that Sergeant Mulvihill reduced his assignments sometime in January of 1992 and that he was not assigned any cases requiring field work. (Dep. of Holbrook I, at 207–08.) In his affidavit, plaintiff states that he has only been assigned "at most" four cases since December 13, 1991.[4] (Pl.Statement of Material Facts [64] at Ex. B., Affidavit of Holbrook, ¶ 21.) According to plaintiff, Sergeant Mulvihill did this because he and the Chief concluded that permitting plaintiff to perform field work created too great a risk of subjecting the City to liability. (Dep. of Holbrook I, at 208.)

### D. On-call status

Occasionally, the detective on-call is called to a crime scene at night. (Dep. of Holbrook I, at 136.) All detectives other than plaintiff drive themselves to a crime scene in a city vehicle. (*Id.* at 137.) Prior to the accident, plaintiff would drive himself to a crime scene in a city vehicle. (*Id.* at 137.) After the accident, plaintiff could respond only with the assistance of a patrol officer, who would pick plaintiff up at his residence. (*Id.* at 136.) During evening and night hours, the police department has four patrol officers on a shift. (*Id.*) The patrol officer who was directed to pick up plaintiff would have to leave his or her assigned patrol area, go to plaintiff's house and transport him to a crime scene. (Dep. of Holbrook I, at 139.) No detective other than the plaintiff requires transportation by a patrol officer to crime scenes. (*Id.* at 141–42.) Of course, because another detective had to accompany plaintiff on calls to a crime scene, essentially two detectives always had to be on call whenever plaintiff was on call. Sometime after November, 1991, plaintiff was taken off on-call status by Sergeant Mulvihill because plaintiff could not respond to initial calls without assistance. (*Id.* at 143.)

### E. Incidents after plaintiff's return to work

After plaintiff's accident, an incident occurred at night when a number of detectives and officers were required to surround a house to try to flush an alleged perpetrator out of the house. (*Id.* at 215.) Plaintiff was not permitted to participate in this incident because the superior officer, Sergeant Brannon, was concerned about plaintiff's safety. (*Id.* at 216.) Specifically, Sergeant Brannon was afraid that plaintiff might not adequately be able to see where he was going. (Dep. of Holbrook I, at 216.) Very angry at Sergeant Brannon because of this decision, plaintiff placed his badge on the Sergeant's desk. (*Id.* at 217.) Later in his deposition, however, plaintiff agreed that the Sergeant's concern was legitimate as plaintiff could not see as well as others in dark conditions at night. (*Id.*) Plaintiff also conceded that, even now, it would be risky for him to participate in a nighttime exercise such as that incident. (*Id.* at 218.)

Another incident occurred when plaintiff accompanied Detective Garren to serve an arrest warrant on a suspect at the suspect's home. (*Id.* at 219.) The suspect was not home, but plaintiff had a conversation with the suspect's mother in the doorway to the house. The mother extended her hand to shake plaintiff's hand. (Dep. of Holbrook I, at 219.) Plaintiff did not see her hand. The mother asked plaintiff if it was against his policy to shake hands with people. Plaintiff replied that he did not see her hand. (*Id.*) Plaintiff then shook hands with the mother. Later, plaintiff discussed the incident with Detective Garren. Plaintiff told him that he did not see the mother's hand because she was facing his right side. (*Id.*)

Finally, an incident occurred when plaintiff went to a business burglary with Sergeant Mulvihill. Sergeant Mulvihill was finger-

---

4. Plaintiff's supervisor, Sergeant Mulvihill testified that plaintiff had been assigned four or five cases "that could be handled right there in the office, [with] a phone call where I knew that Detective Holbrook wouldn't have to get in a car … [or] physically confront somebody" after December, 1991. (Dep. of Mulvihill, June 3, 1992, at 70.) Mulvihill also testified that plaintiff put together a photo file of arrest pictures for the department after November of 1991. (Dep. of Mulvihill, August 12, 1993, at 10–11.)

printing an object that was on the ground and he testified that plaintiff "about fell completely over me, tripped right over me." (Dep. of Mulvihill, June 3, 1992, at 37.) In his first deposition, plaintiff was asked about this incident.

Q. Was there a time during this investigation that Sergeant Mulvihill was fingerprinting an object that was on the ground, laying on the ground?

A. Yes, sir.

. . . . .

Q. At any time during this investigation did you stumble over Sergeant Mulvihill, did you bump into him, do you recall?

A. I don't recall stumbling over him.

Q. Did you bump into him?

A. I don't recall, but there's a possibility.

Q. Do you recall whether or not you bumped into him when he was fingerprinting this object that was on the ground?

A. I don't believe I did, sir.

Q. Do you frequently bump into objects or people?

A. Frequently, no.

Q. Is it a regular occasion any more so than before your accident?

A. More so after my accident, yes, sir.

Q. Because you can't see as well now?

A. Yes, sir.

(Dep. of Holbrook I, at 118–119.)

### F. Aimpoint 3000 scope

All Alpharetta police officers *must carry weapons while on duty* and must qualify on their weapons yearly. Since his accident, plaintiff has used a specially mounted scope on his nine-millimeter Beretta weapon to qualify with his weapon. (Dep. of Holbrook I, at 173–74.) The Aimpoint 3000 scope has a red dot that plaintiff fixes upon the target. The scope does not give plaintiff an expanded field of view nor does it enlarge the image. (*Id.* at 181.) Plaintiff purchased this scope himself and had a gun shop mount the scope on his weapon. (*Id.* at 175.) The scope

operates on batteries which plaintiff changes on a regular basis, approximately every three to four months. (*Id.* at 182–83.)

Even though the scope has a red dot that plaintiff aims at his target, plaintiff must still "acquire his target." (*Id.* at 185.) Acquiring a target is the process of determining what it is that the shooter will shoot. For example, if two people are both standing ten feet apart from each other, the shooter must decide whether to shoot at person A or person B.

On April 7, 1992, Chief Waters distributed an order stating that all officers should remove any modifications to their weapons for the next qualification test, which was three weeks from his order. Plaintiff asked for permission to use his sight during the qualification, but the Chief denied his request. Plaintiff moved for a temporary restraining order to enjoin defendants from requiring him to qualify without the sight. A "duty judge" of this Court granted plaintiff's temporary restraining order, and plaintiff did not take the qualification test. The case was then assigned to this court, and this court dissolved the temporary restraining order on October 8, 1992, meaning that the defendants could require plaintiff to submit, without the aid of a sight, to a firearms qualification examination. In its Order of March 29, 1993, this Court also denied plaintiff's request for a preliminary injunction to prevent defendants from prohibiting plaintiff's use of a sight on his firearm on an upcoming firearm qualifications examination. (Order [45] at 20.)

In October of 1992, plaintiff passed the Department's firearms qualifications examination without the use of the Aimpoint 3000 scope.[5] After that, plaintiff again requested that he be assigned cases, be assigned duties and be allowed to function as a Detective within the Police Department. (Pl.Amended Compl. at 19.) Plaintiff's requests were denied.

### G. Requests for promotion

Under Chief Abernathy, plaintiff twice applied for a promotion to detective sergeant in

---

**5.** As mentioned earlier, plaintiff's passing of the firearms course without the aid of the scope made the issue of the use of the Aimpoint 3000 scope as a reasonable accommodation irrelevant.

(*See* Hr'g Tr. Oct. 26, 1994, at 28 (Plaintiff's counsel stated that no accommodation was necessary since plaintiff passed the test).)

letters dated January 9, 1990 and January 4, 1991. (Dep. of Holbrook I, at Ex. 1–2.) When plaintiff first applied for a promotion, the detective division had three detectives, including plaintiff, and one lieutenant. (*Id.* at 155.) The detective sergeant had been transferred out of the detective division. (*Id.* at 156.) Chief Abernathy advised plaintiff that there was not enough money in the budget to promote someone to detective sergeant. (*Id.* at 157.) The position of detective sergeant was not filled that fiscal year.

When plaintiff submitted his second request for a promotion on January 4, 1991, there was no open position available in the detective division; however, in the uniform division, a sergeant had been promoted to lieutenant. (*Id.* at 161.) Plaintiff was told that the position of sergeant was not being filled because the department was too top-heavy. (Dep. of Holbrook I, at 164.) No position of sergeant was posted in the department.

Sometime after Chief Waters became the chief, plaintiff met with him and another detective to discuss the possibility of a promotion to either of two positions: an "office supervisor, sergeant in detectives, [or] a field supervisor, sergeant in detectives." (*Id.* at 144.) According to plaintiff, Chief Waters suggested the promotion "[d]ue to my—I guess my inadequacies of being able to go out in the field." (*Id.*) In his conversation with Chief Waters, plaintiff stated, "I was aware of my capabilities of not being able to perform some tasks." (*Id.*) Plaintiff viewed the office supervisor position as a position where he would handle paperwork and advise people regarding the proper course of action when they came to the police station with a complaint. (*Id.*) According to plaintiff, this position would not involve any field investigation, but would involve some criminal investigation, such as interviewing witnesses or suspects who came to the station. (Dep. of Holbrook I, at 145–46.) The "position" of an office supervisor in detectives would have been a new position and would have required a restructuring of the department. (*Id.* at 148.) The position was never created.

In November of 1991, defendants hired Sergeant Mulvihill into the position of detective sergeant. Sergeant Mulvihill was hired from outside of the City of Alpharetta and had prior supervisory experience. The city handbook states that "[a]s far as practical, vacancies shall be filled by promotion of employees of the City of Alpharetta. All vacancies shall be announced to City employees. . . ." (Pl.Statement of Mat.Facts [64] at Ex. E.) The defendants did not post the job opening and therefore, plaintiff did not apply for the position, nor was he considered for the position.

**H. Job descriptions**

The City of Alpharetta has promulgated job descriptions for the positions of detective and detective sergeant. The relevant parts of the job description for detective are as follows.

EXAMPLES OF WORK

1. Apprehension activity both during preventative patrol and in response to calls for service.

2. Responsible for responding to the initial call in those situations mandating a plainclothes unit.

3. Preliminary investigation activity—interviews, inquiries.

4. Evidence collection—maintenance of evidence chain.

5. Administrative activity. In addition to case load evaluation and management, this includes service to the public and other activities not immediately directed to assigned cases.

6. Follow-up activities—arrest, reports, and court preparation.

7. Reviews incident reports of assigned cases.

8. Obtains search warrants, arrest warrants, etc., as necessary.

9. Works with all other law enforcement agencies on a wide spread of criminal activities.

10. Writes supplemental reports on all cases he/she has cleared or not cleared.

11. A detective unit regardless of rank when called upon by a U.P.D.[6] officer at a crime scene is in charge of that crime scene at the time he/she arrives, and all information relating to that crime scene that the investigating U.P.D. officer has, will be turned over at that time.

12. Any other duties and responsibilities that are assigned by the C.I.D.[7] Commander.

### DESIRABLE KNOWLEDGE, SKILLS, AND ABILITIES

Knowledge of Georgia Law and City Ordinances.
Knowledge of Patrol area.
Skill in the use of firearms.
Skill in report writing.
Ability to communicate effectively with the public.
Ability to stay calm in stressful situations.

. . . . .

### NECESSARY SPECIAL REQUIREMENTS

GA Drivers License.
GA Post [8] Certified.
Certified in the use of firearms.

(Pl.Statement of Material Facts [64] at Ex. B, Att. 1.)

Plaintiff contends that he can perform all but two of the duties of a detective either with no accommodation or with existing accommodations which he has provided to the City at no cost. (*Id.* at ¶ 19–21.) The two duties that plaintiff admits he cannot perform without any or existing accommodations are evidence collection and responding to the initial calls in those situations mandating a plainclothes unit. (*Id.* at ¶ 20.) [9] Specifically, plaintiff states that

> [w]ith respect to evidence collecting, it is beyond dispute that Plaintiff is able to gather all evidence at a crime scene with the exception of fingerprint samples and

fiber evidence. With respect to responding to initial calls in those situations mandating a plainclothes unit, Plaintiff is unable to do such without the help of a driver. However Plaintiff has been allowed in the past to respond to these calls with another Detective or by way of another unit dispatched to the call.

(*Id.*)

The relevant parts of the job description for detective sergeant are as follows.

### EXAMPLES OF WORK

1. Assignment and supervision of subordinates workload by priority.

2. Assessment of work quality and quantity and compliance to departmental rules.

3. Initiation of disciplinary action, conduct, field training and efficiency within C.I.D.

4. Is the training officer for new officers assigned to C.I.D.

5. Keeping apprised on unsolved cases and persons sought.

6. Maintenance of good morale and proper conduct.

7. Notifies the C.I.D. Commander if supplies get low in relation to the C.I.D. operation.

8. Evaluation of performance of subordinates.

9. Investigations into criminal activity within the City.

10. The location/interview/interrogation of victims, suspects, and witnesses.

11. Making arrest for violation of laws or ordinances (either on scene apprehension or by warrant.)

12. Maintaining records of investigation and preparing detailed offense and case reports.

---

6. U.P.D. means Uniform Police Division.

7. C.I.D. means Criminal Investigation Division.

8. P.O.S.T. means Peace Officer Standards and Training.

9. Further, it would also appear that plaintiff's vision deficiencies would make it difficult for him to apprehend suspects, as is a requirement of the detective position.

13. Assisting prosecuting attorneys in preparing cases for court.

14. Cooperation with Local, State, and Federal law enforcement officials in relation to the investigation of a wide variety of criminal offenses.

15. Going to the crime scene and doing necessary paperwork, evidence collection, and photographs.

16. Taking evidence to State Crime Lab.

17. Any other duties and responsibilities that are assigned by the C.I.D. Commander.

### DESIRABLE KNOWLEDGE, SKILLS, AND ABILITIES

Knowledge of GA Law and City Ordinances.
Knowledge of Patrol area.
Skill in the use of firearms.
Skill in report writing.
Ability to communicate effectively with the public.
Ability to stay calm in stressful situations.

. . . . .

### NECESSARY SPECIAL REQUIREMENTS

GA Drivers License.
GA Post certified.

(Pl.Statement of Material Facts [64] at Ex. B, Att. 2.)

With regard to the duties of a detective sergeant, plaintiff states he can perform all but two duties of the detective sergeant position either with or without reasonable accommodation. The two duties that plaintiff admits he cannot perform are evidence collection, as discussed earlier, and taking evidence to the State Crime Lab. (*Id.* at ¶ 24.)

### I. P.O.S.T. investigation

Chief Waters requested that P.O.S.T., the Georgia Peace Officers Standards and Training department which certifies police officers, conduct an investigation to determine if plaintiff was fit for duty in light of his eye condition. (Dep. of Holbrook I, at 251.) In a letter on May 22, 1992, the Director of P.O.S.T.'s Certification Division concluded that the investigation should be administratively closed.[10] (Pl.Statement of Material Facts [64] at Ex. J.) An attachment to the letter, however, erroneously notes that plaintiff has "passed the vision requirements for a driver's license." (*Id.*)

### J. Notice to City of claim and subsequent events

On December 12, 1991, pursuant to GA. CODE ANN. § 36–33–5, plaintiff sent defendants notice of a claim for adjustment of damages incurred as a result of allegedly discriminatory actions taken by the City of Alpharetta. Specifically, plaintiff alleged that sometime in December of 1991 defendants took away his duties and responsibilities as a detective, refused to assign him cases, and assigned him menial tasks. (Pl.Amended Compl. [50] at 18–19.) Plaintiff also alleges that defendants issued him a negative work performance appraisal on January 27, 1992. (Pl.Statement of Material Facts [64] at Ex. B Aff. of William Holbrook ¶ 23.) On January 30, 1992, plaintiff filed this suit against the City of Alpharetta and other defendants.

### K. Resignation and rehabilitation scholarship

In October of 1992, while still employed with the City, plaintiff submitted an application for a federal rehabilitation services scholarship to pursue a full-time program of study at the University of Georgia. (Dep. of Holbrook II, at 8.) On December 2, 1992, plaintiff submitted his letter of resignation to Chief Dillon. (Dep. of Holbrook II, at Ex. 3.) Chief Dillon did not immediately accept his resignation and offered to let him revoke his resignation prior to December 15, 1992. (*Id.* at Ex. 4.) Plaintiff did not revoke his resignation, received the rehabilitation services scholarship, began his course work at the University of Georgia in January of 1993, and

---

**10.** The Court is uncertain what the significance of this finding is. In oral argument, plaintiff's counsel contends that P.O.S.T. found that the plaintiff was qualified. Defendants, on the other hand, contend that, while P.O.S.T. did not revoke the plaintiff's certification, it made no determination as to whether the plaintiff was able to perform the essential duties of a detective in the City of Alpharetta Police Department.

is currently enrolled at the University of Georgia. (*Id.* at 5.) Although the timing of plaintiff's resignation suggests that the impetus for his resignation was the receipt of a full college scholarship, plaintiff argues that he was constructively discharged by defendants.

## III. Legal Discussion

### A. Summary judgment standard

■ Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

■ The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. at 2552–53; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence[11] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. at 2553 (quoting FED.R.CIV.P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to

the non-moving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. at 2510. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. at 2510–11. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

### B. ADA and Section 504 claims

#### 1. Plaintiff's Grievance

■ In order to recover under either the ADA or Section 504 of the Rehabilitation Act, plaintiff must be a "qualified individual with a disability" or "otherwise qualified." 42 U.S.C. § 12112(a); 29 U.S.C. § 794(a). Under both statutes, to be considered a qualified individual, plaintiff must be able to perform the essential functions of the position, with or without reasonable accommodations.

---

**11.** The non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

42 U.S.C. § 12111(8).[12] A reasonable accommodation should impose no undue hardship to the employer. Moreover, an employer is only required to make reasonable accommodations when the reasonable accommodations will enable the employee to perform the essential functions of the job. If the employee is unable to perform the essential functions of the position with reasonable accommodations, then the employer has no duty to eliminate the essential functions of the position or to hire someone else who can perform those functions for the employee. *See Larkins v. CIBA Vision Corp.,* 858 F.Supp. 1572, 1585 (N.D.Ga.1994) (Evans, J.) (granting summary judgment for defendant because plaintiff could not perform two essential functions of job with or without reasonable accommodation).

Plaintiff contends that he is a qualified individual with a disability. Under the ADA, the term qualified individual with a disability means

> an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position.

29 C.F.R. § 1630.2(m). Both parties agree that if plaintiff is not a qualified individual for the position of detective, then plaintiff will not be a qualified individual for the position of detective sergeant. Therefore, the Court's analysis will focus only on the position of detective.

Throughout this litigation, it has been difficult to discern plaintiff's grievance against the City of Alpharetta. At the time of his tragic accident, the City kept plaintiff on the payroll for ten months while he recuperated. Likewise, when he was able to return to work, the defendants allowed him to remain on the payroll, without any diminution in his salary, even though plaintiff was unable to perform essential functions of his detective's position and even though, with a detective force usually of only three officers, plaintiff's inability to perform fully as a detective meant that one of the two other detectives had to be pulled off other tasks to perform some of plaintiff's duties. Indeed, it was the plaintiff who finally resigned his position; throughout this litigation, the City of Alpharetta has never made any attempt to discharge plaintiff as a result of plaintiff's inability to function fully as a detective.

In the typical ADA or Rehabilitation Act claim, the employer has discharged an employee because the employer believes that the employees' disability prevents him from performing essential functions of the job; in such cases, the employee sues, arguing either that he could perform all the essential functions of the job or that he could perform such functions, if only the employer would make reasonable accommodations to allow him to do so. Here, as noted, the City never discharged plaintiff or reduced his salary. Instead, the City kept him on, at the same salary, allowing him to perform office duties that the City believed he was able to perform, given his significant impairment of vision. Plaintiff's complaint thus appears to be that the City discriminated against him because they did not permit him to continue to be assigned the same tasks that he was assigned prior to suffering the accident that left him blind in one eye and with a severely reduced range of vision in the other eye. Specifically, plaintiff argues that the City discriminated against him, as a result of his disability, by not allowing him to conduct field investigations.

It is true that in the first few years following plaintiff's accident, the City permitted him to participate in field investigations of crimes.[13] The City was able to do so, howev-

---

**12.** The Rehabilitation Act states that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq. . . . ." 29 U.S.C. § 794(d)). Consequently, the references in this Order to the ADA and to the regulations promulgated pursuant to the ADA apply to plaintiff's Rehabilitation Act claims, as well as to his ADA claims.

**13.** Plaintiff asserts "that for a number [of] years subsequent to the acquisition of his disability Defendants continually provided accommodations for Plaintiff through the shifting of duty assignments, providing transportation. . . ." (Pl. Supp.Brief [78] at 18.)

er, only by the expenditure of additional manpower, significant to a City with a small detective force, who performed essential functions that plaintiff could not perform. Specifically, plaintiff admits that he could not perform all evidence collection, as a result of his visual impairment. As evidence collection is a crucial function for a detective investigating a crime, this inability on plaintiff's part made it necessary for the City to send a second detective along on any criminal field investigation [14] to which plaintiff was sent. With a small detective squad, the City of Alpharetta typically sent only one detective to the site of an investigation; plaintiff was the only detective whose presence at a scene required that an additional detective be sent.

Plaintiff argues, however, that while he could not collect fiber or fingerprint evidence, he could collect other evidence. No matter what other evidence the plaintiff may have been able to collect, however, his inability to collect all evidence made it necessary for the City always to send a second detective on any investigation in which plaintiff was involved. Moreover, the Court concludes that plaintiff describes too narrowly the problems for the City that his participation in an investigation could cause. An investigating agent must not only collect the evidence that he observes, but must also possess the ability to thoroughly examine a crime scene to insure that he has identified all relevant evidence and can describe credibly the location of all evidence, in relation to other evidence. Plaintiff's severe limitations of vision, as well as some of the incidents that occurred when he did go out on investigations, make it clear that the City could not be certain that a crime scene, or area of a crime scene, to which plaintiff has been assigned would have been investigated thoroughly for the identification of all evidence and description of the crime scene.

In addition, it is the duty of an investigating detective not only to uncover and to seize all evidence at a crime scene, but also to testify credibly about the evidence seized and about the thoroughness of the investigation. Unless a second detective followed behind plaintiff throughout his investigation of a crime scene, it is clear that, as a witness at a trial, plaintiff would be subject to very damaging cross-examination by a criminal defense attorney as to the thoroughness of his investigation and as to the accuracy of his testimony about his observations of the crime scene. Moreover, even with the presence of a second detective, the City held legitimate concerns that, with his vision impairment, plaintiff's presence at the crime scene could, itself, compromise the integrity of the investigation or cause a disturbance of the crime scene.[15] In addition, although the City of Alpharetta apparently has less violent crime than some other jurisdictions, an investigator must also be prepared to deal with and apprehend violent offenders at the scene of an investigation. As noted above, plaintiff's superiors were concerned about his ability to handle himself, particularly in the evening hours, in situations where the police might have to defend themselves or encounter an offender. The need to monitor plaintiff's safety in such a situation could compromise the other detective or officers' ability to adequately handle the situation.

Finally, plaintiff's inability to participate in the investigation of a crime scene without the assistance of a second detective also affected the number of days that other detectives were required to be on call during their off-duty hours. Prior to plaintiff's accident, it appears that each of the three detectives were generally on call every third day. After plaintiff's accident, during the period of time that he did participate in investigations with the assistance of a second detective, then presumably the two remaining detectives had to be on call every two days.

With regard to his inability to collect all evidence at crime scenes, plaintiff responds that, in the past, defendants have sent a second detective to perform the investigative duties that plaintiff could not perform and

---

**14.** The Court recognizes that plaintiff did investigate natural deaths without the assistance of another detective, however, no evidence is before the Court indicating that plaintiff performed criminal field investigations alone.

**15.** *See* discussion regarding essential functions *infra.*

that defendants have not shown why a continuation of these "accommodations" would constitute an undue hardship. In making this argument, plaintiff confuses the concept of "essential function" with the concept of "reasonable accommodation." Thus, if the City's furnishing of a second detective to perform tasks assigned to plaintiff constituted a "reasonable accommodation" in the past, the City would be required to show why a continuation of this accommodation created an undue hardship. If, however, the tasks that the second detective had to perform for plaintiff were, themselves, essential functions of a detective's job, then the fact that the City had decided to cease assigning someone else to do plaintiff's work would not require any showing of undue hardship on its part. For the reasons discussed below, the Court concludes that the collection of evidence is an essential function of a detective's position in the City of Alpharetta Police Department.

**2. Essential functions**

 It is undisputed in this case that plaintiff cannot collect certain types of evidence at a crime scene. Plaintiff argues that this duty is not an essential function of a detective position. Under the ADA, essential functions are defined as the fundamental job duties of the position and do not include the marginal functions of the position. 29 C.F.R. § 1630.2(n). There are three identified job functions that may be considered essential for the purposes of the ADA: (1) the reason the position exists is to perform the function; (2) there is a limited number of employees available among whom the performance of the job function can be distributed; and (3) the function is highly specialized so that the incumbent in the position was hired for his or her expertise or ability to perform the particular function. 29 C.F.R. § 1630.2(n)(2)(i)–(iii).

With regard to the first factor, plaintiff asserts that the position of detective exists to solve crimes. Plaintiff argues that a detective need not be able to solve every crime committed in the City of Alpharetta. The Court agrees that no detective will be able to solve every crime committed in Alpharetta. Every detective, however, should have the ability to collect all the evidence present at any particular crime scene to which he is assigned in order to enhance the likelihood of solving the crime. Moreover, a detective must also be able to testify credibly about the thoroughness of his investigation; a detective with a visual problem as severe as plaintiff's would always be subject to damaging cross-examination concerning his ability to observe and identify all relevant evidence on a scene.

The second factor indicates that a function may be essential because of the number of employees available. In this case, the City has only three detectives. Accordingly, there are clearly a limited number of detective employees available to the City of Alpharetta Police Force. Plaintiff contends, however, that the City should shuffle its assignments of detectives in a way that will avoid having plaintiff assigned to cases requiring the collection of evidence, such as fiber and fingerprints. This Court cannot agree.

In the first place, the City cannot always know in advance of a particular investigation, whether it will require the collection of fiber or fingerprint evidence. Moreover, even if the City could comfortably ascertain that information in advance, it has a force of only three detectives. Requiring one of its two other detectives to leave another investigation or to leave their other assigned tasks to help plaintiff perform his assigned investigations reduces by a third the available detectives for a particular investigation. If only two of the three detectives are able to collect all types of evidence, then the city effectively has only two detectives, not the three it is paying, to perform those functions. Indeed, the City felt it necessary to send a second detective along on all investigations to which plaintiff was assigned, not just those in which it could be anticipated that fingerprint or fiber evidence would have to be collected. Moreover, as noted above, even if plaintiff is able to collect some evidence, he could be subject to cross-examination at trial about the thoroughness of any investigative efforts.

Finally, with regard to the third factor, the function of collecting evidence is highly specialized. Detectives receive training in how

to collect different types of evidence. (*See* Dep. of Holbrook I, at 258 (discussing training in collection of blood splatters and footprints)). In sum, upon analysis of all three factors, the Court concludes that the collection of evidence is an essential function of a detective's position.

In addition to identifying the three types of job functions that should be considered essential for a particular job, regulations promulgated pursuant to the ADA also identify seven types of evidence that indicate what functions are essential:

(1) The employer's judgment as to which functions are essential;

(2) Written job descriptions prepared before advertising or interviewing applicants for the job;

(3) The amount of time spent on the job performing the function;

(4) The consequences of not requiring the incumbent to perform the function;

(5) The terms of a collective bargaining agreement;

(6) The work experience of past incumbents in the job; and/or

(7) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(i)–(vii). These factors likewise support an inference that the collection of evidence is an essential function of a detective's position.

With regard to the second factor, the written job description indicates that a detective is responsible for the collection of all evidence. With regard to the third and fourth factors, the amount of time and the adverse consequences of not requiring an employee to perform the function, plaintiff argues that detectives spend very little time investigating crimes that require the collection of evidence. Additionally, plaintiff argues that the City suffered no adverse consequences by allowing plaintiff to work only certain types of crimes.

Assuming that detectives for the City spend a relatively small portion of their time collecting evidence, the significance of the function nevertheless far outweighs the amount of time actually spent performing the function. The Technical Assistance Manual gives two particularly appropriate examples:

An airline pilot spends only a few minutes of a flight landing a plane, but landing the plane is an essential function because of the very serious consequences if the pilot could not perform this function.

A firefighter may only occasionally have to carry a heavy person from a burning building, but being able to perform this function would be essential to the firefighter's job.

TITLE I OF THE AMERICANS WITH DISABILITIES ACT EEOC'S TECHNICAL ASSISTANCE MANUAL 90:0516.

Like the pilot and the firefighter, a detective may spend only a small amount of his or her time collecting evidence at crime scenes. Because the goal of a detective's investigation is to solve the crime and to uncover adequate evidence to cause a jury to convict the perpetrator, the consequences of not collecting evidence or of having one's credibility on the integrity of the investigation effectively attacked at trial are clearly catastrophic.

With regard to factor six and seven—the work experience of past and present incumbents—and factor one—the employer's judgment concerning the essentialness of the function—plaintiff contends that, because he was permitted to work as a detective without performing certain functions for several years, the defendants' argument that the detectives of the City of Alpharetta must perform all functions and investigatory work is highly suspect. The Court does not agree.

First, plaintiff has supplied the Court with no evidence indicating that any other detective, past or present, was permitted to work only certain types of cases. The EEOC Technical Assistance Manual states that "[t]he work experience of previous employees in a job and the experience of current employees in similar jobs provide pragmatic evidence of actual duties performed." TITLE I OF THE AMERICANS WITH DISABILITIES ACT EEOC'S TECHNICAL ASSISTANCE MANUAL 90:0516. Plaintiff was the only detective who did not work all types of cases, could not collect evidence, and did not drive. Thus,

plaintiff's situation is unique in the history of the Alpharetta Police Department.

■ That the City required another detective to accompany plaintiff on any investigation does not suggest that those functions that plaintiffs was unable to perform were non-essential, but instead indicates defendant's awareness that plaintiff could not perform these functions and that they were sufficiently important to require the attention of one of the two remaining detectives on staff. That an employer utilizes for several years an alternative method for the performance of certain tasks that a disabled employee cannot perform might weaken an argument that use of this alternative method poses an undue hardship for the employer; it does not, however, suggest that the task, itself, is not essential. Indeed, plaintiff's approach could have the unfortunate effect of discouraging employers' willingness to be flexible in trying to accommodate disabled employees or applicants. A generous employer may wish, initially, to forego certain tasks that a disabled employee cannot perform, in an effort to assess whether the employee's total performance is otherwise satisfactory or cost-effective for the business. Plaintiff would argue that such conduct by the employer constitutes a waiver forever of a contention that the function is essential. The likely consequence of plaintiff's approach is that it would encourage employers to be rigid in their insistence that a disabled employee be able to perform all enumerated "essential" tasks and would discourage efforts to give a disabled person a chance to see if he can perform a particular job.

In this case, it appears that the City of Alpharetta treated plaintiff very kindly in the aftermath of his tragic accident. Superiors who had worked with him for years and who presumably felt great sympathy for the unfair fate that plaintiff had suffered permitted him to return to the police department and never reduced his pay, transferred him or demoted him. The City attempted to allow him to work as a detective, as fully as he was able to do so. It tried to protect plaintiff by assigning him a partner, even though there were only three detectives in the entire squad and no other detective had ever had a partner. When a new chief and a new supervisor arrived at the police department, however, they concluded that plaintiff could not perform essential duties required of an investigative detective and, accordingly, they would not permit plaintiff to handle field investigations. That the new management decided that it was no longer appropriate to have a second employee perform certain designated duties of plaintiff's position does not reflect a change of opinion on the essentialness of these tasks, but instead an unwillingness to expend additional manpower for an employee who cannot handle all his duties.[16] Accordingly, after analyzing the factors and evidence of essential functions, this Court concludes that the collection of evidence is an essential function of the detective position with the Alpharetta Police Department. Because the City arguably could have terminated plaintiff from his detective's position as a result of his inability to perform an essential function, it likewise had the right to insist that plaintiff not involve himself in tasks that required the performance of those functions that he could not carry out.

### 3. Reasonable accommodations

■ Plaintiff argues that even if he could not perform certain essential functions, his employer was required to make reasonable accommodations to permit him to perform these functions. Plaintiff argues that accommodation can be made for the plaintiff's disability "by the mere shuffling and reassign-

---

**16.** Do the ADA and § 504 mean that employers are required to accept, in perpetuity, less than a full performance of all essential functions of a job, because at some time in the past they may have permitted less than full performance? Suppose a company has three employees who are required to produce three widgets and three wodgets a day. Assume that two of those employees always produce their daily quota, but that one of the employees, who has contracted an ADA disability during the term of his employment, has produced only three widgets and no wodgets a day since the onset of his disability because he was unable to produce wodgets, even with reasonable accommodation. If new management buys the company, can it insist that all employees produce their required quota of products? The plaintiff would answer, "No." This Court disagrees.

ment of cases." (Pl.Supp.Brief [78] at 17.) During oral argument, plaintiff's counsel explained to the Court that this case "revolves around assignments. . . . in the past he was given assignments, that he was able to perform all the essential functions thereof, and that he can continue to do all the essential functions of a detective's position." (Transcript, Oct. 26, 1994, at 40.)

The ADA requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). The ADA defines reasonable accommodation as including "[j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices." 42 U.S.C. § 12111(9)(A). Essentially, plaintiff is arguing that defendants should accommodate him by restructuring his job duties so that he does not have to work certain types of cases: i.e., those that would require the collection of certain types of evidence. But, as noted above, the City cannot always know in advance what kinds of cases will require the collection of which types of evidence. Moreover, as noted above, plaintiff has been unduly narrow in articulating his difficulties in performing investigative functions. That is, because of its legitimate concerns about plaintiff's inability to handle totally *any* particular criminal investigation, the City had to send a second detective along with plaintiff on all criminal investigations. Accordingly, plaintiff's true position is that the City must reasonably accommodate him by sending a second detective along on any investigative assignment, even though the City does not otherwise send two detectives to a crime scene.

The EEOC Technical Assistance Manual provides an example of a job restructuring type of reasonable accommodation: "restructuring a job by reallocating or redistributing *marginal job functions.*" TITLE I OF THE AMERICANS WITH DISABILITIES ACT EEOC's TECHNICAL ASSISTANCE MANUAL 90:0521. Additionally, the regulations promulgated pursuant to the ADA provide some guidance on the issue of job restructuring.

Another of the potential accommodations listed is "job restructuring." An employer or other covered entity may restructure a job *by reallocating or redistributing nonessential, marginal job functions. . . .*

An employer or other covered entity is *not required to reallocate essential functions.* The essential functions are by definition those that the individual who holds the job would have to perform, with or without reasonable accommodation, in order to be considered qualified for the position. For example, suppose a security guard position requires the individual who holds the job to inspect identification cards. An employer would not have to provide an individual who is legally blind with an assistant to look at the identification cards for the legally blind employee. In this situation *the assistant would be performing the job for the individual with a disability rather than assisting the individual to perform the job.*

29 C.F.R. § 1630.2(*o*) (Appendix) (emphasis added).

Courts interpreting the ADA have also concluded that an employer need not restructure the essential functions of the job as a reasonable accommodation. *See Larkins v. CIBA Vision Corp.,* 858 F.Supp. 1572, 1583 (N.D.Ga.1994) (Evans, J.) ("The ADA, however, does not require Defendant to eliminate an essential function of the . . . position to accommodate Plaintiff."); *Ethridge v. Alabama,* 860 F.Supp. 808, 816 (M.D.Ala.1994) ("Thus, although a disabled employee must be reasonably accommodated in order to perform the essential function, an employer need not hire an employee who cannot perform the essential function even with reasonable accommodation."); *Henchey v. Town of North Greenbush,* 2 A.D. Cases 1232, 1237–38, 831 F.Supp. 960 (N.D.N.Y.1993) ("while reasonable accommodation 'may include such adjustments as . . . job restructuring' . . . it does not entail the elimination of any of the job's essential functions. . . . However, 'job restructuring' may include the shifting of nonessential duties to other employees."). With regard to Section 504 of the Rehabilitation Act, the Supreme Court has stated that "[w]hen a handicapped person is not able to

perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable *the handicapped person to perform those functions."* *School Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987) (emphasis added).

 Thus, while the ADA and § 504 would require an employer to restructure the marginal functions of a job as a reasonable accommodation, neither statute requires the employer to restructure the job so that the individual with a disability does not have to perform essential functions. Just as an employer who advertises a security guard position is not required to hire blind applicant if the latter's hiring requires the assignment of a second individual to perform the inspection of identification cards that is an essential function of the security guard position, neither § 504 or the ADA require the City of Alpharetta to assign a second detective to perform plaintiff's essential duties.[17]

### 4. CONSTRUCTIVE DISCHARGE

 As noted, in December of 1992, plaintiff resigned, arguing that the City's failure to allow him to conduct field investigations constituted a constructive discharge of him. Having concluded that plaintiff was not a qualified individual with a disability for a

detective's position, this Court concludes that defendants likely could have legally discharged plaintiff from that position. Moreover, with regard to plaintiff's claim of constructive discharge, the Court finds that plaintiff has not met the standard of showing that the employer made his working conditions so intolerable that he was forced to resign. *Buckley v. Hospital Corp. of America, Inc.,* 758 F.2d 1525, 1530 (11th Cir.1985). In this case, it is undisputed that plaintiff's base salary, title and benefits were never changed after his accident. Plaintiff's only reduction in pay after his accident was when he was taken off the on-call list and therefore did not receive overtime pay for on-call work. While plaintiff may not have liked his modified assignments or reduced responsibilities, no reasonable person would have felt compelled to resign as plaintiff did. *See Frazer v. KFC Nat'l Management Co.,* 491 F.Supp. 1099, 1106 (M.D.Ga.1980) (finding no constructive discharge when plaintiff was offered position involving less responsibility but receiving same pay and benefits or another equally attractive job offer or franchise opportunity), *aff'd without opinion,* 636 F.2d 313 (5th Cir.1981). *See also Garner v. Wal-Mart Stores, Inc.,* 807 F.2d 1536 (11th Cir. 1987) (affirming no constructive discharge when plaintiff returned to work after maternity leave, was assigned dissimilar and lesser

---

**17.** The City also argues that plaintiff cannot perform a second essential function of his job: that is, he cannot drive, as is explicitly required of all persons holding a detective's position. The City requires that a detective be able to drive because in order to investigate a crime scene and collect evidence, the detective must first be able to get to the crime scene. Indeed, the job description for detective lists a Georgia Driver's License as a "NECESSARY SPECIAL REQUIREMENT" for this position.

Plaintiff has not driven since the accident, does not currently hold a Georgia Driver's License, and does not intend to obtain a driver's license unless his visual acuity improves. (*See* Dep. of Holbrook II, at 14.) Thus, for this reason alone, plaintiff does not meet the stated requirements of a detective's position.

One could argue that the ability to drive is not the essential function involved in the requirement, but instead that the implicit objective is the ability to reach a crime scene promptly. The Court does not reach the question whether, as a reasonable accommodation, the City could be required another officer to go to plaintiff's house

and pick him up whenever he was needed at the scene of a crime. Such a requirement creates difficulties for the defendant that arguably render such an accommodation unreasonable. That is, the need to pick up plaintiff would always delay the driving officer in his ability to get to the crime scene quickly or, if the defendant feels it has to have one office report promptly to the scene, it would be required to assign one officer to get to the scene as quickly as possible and a second, possibly unnecessary officer, to pick up plaintiff. While such an accommodation might not be unreasonable in a large police force, it could pose problems in a force as small as the City of Alpharetta's.

Because the Court has already concluded that the plaintiff cannot perform an essential function of his position—the investigation of and collection of evidence at a crime scene—with any accommodation, the Court does not reach the question whether the plaintiff could perform an another function of his job—the ability to arrive at a crime scene quickly—with reasonable accommodation.

position as floater with no reduction in her hourly rate, and resigned after one full day back at work). Accordingly, the Court grants defendants' Motion for Summary Judgment on all claims alleging violations of the ADA and Section 504 of the Rehabilitation Act.

### C. 42 U.S.C. § 1983 claim

■ Plaintiff has alleged a claim of violation of his "rights secured under the Federal Rehabilitation Act of 1973, ... and the Americans with Disabilities Act, for which 42 U.S.C. § 1983 provides a remedy." (Pl.Amended Compl. [50] at ¶ 52.) Defendants have already been granted qualified immunity in their individual capacities in this Court's prior Order of September 30, 1994. This Court stated that the claims of violations of 42 U.S.C. § 1983 against defendants in their official capacities remain viable. Claims against defendants in their official capacities are claims against the municipality, in this case the City of Alpharetta, of which the individual defendants are agents. *Owens v. Fulton County,* 877 F.2d 947, 951 n. 5 (11th Cir.1989).

At the outset, the Court questions whether plaintiff may maintain a 42 U.S.C. § 1983 for violations of the ADA and the Rehabilitation Act. *See Lussier v. Dugger,* 904 F.2d 661, 671 n. 12 (11th Cir.1990) ("If Lussier is entitled to relief under § 794 itself, there seemingly will be no need to consider whether such entitlement would also enable him successfully to claim under § 1983 for a § 794 violation."); *Kraft v. Memorial Medical Center, Inc.,* 807 F.Supp. 785, 787 (S.D.Ga.1992) ("Arguably, in the Eleventh Circuit, the Rehabilitation Act may not be the basis of a § 1983 'laws' claim."). *But see Bodiford v. State of Alabama,* 854 F.Supp. 886 (M.D.Ala. 1994) (holding that plaintiff may maintain his § 1983 claim based upon violation of the Rehabilitation Act); *Christopher N. v.*

*McDaniel,* 569 F.Supp. 291, 298 (N.D.Ga. 1983) (Ward, J.) (holding that "claim under § 1983 is generally sustainable" in conjunction with Rehabilitation Act claim). *See generally Conlon v. City of Long Beach,* 676 F.Supp. 1289, 1298 n. 12 (E.D.N.Y.1987) (reviewing decisions regarding whether statutory remedies of Section 504 are sufficiently complete to foreclose resort to Section 1983).

Defendants argue that plaintiff may not pursue a § 1983 claim based upon an alleged violation of the ADA because the ADA has an express statutory provision for enforcement which limits the powers, remedies and procedures of the ADA to those set forth in Title VII. *See* 42 U.S.C. § 12117. Defendants further argue that Section 504 of the Rehabilitation Act also creates a comprehensive remedial framework similar to that established by Title VII and the ADA and thus, an alleged violation of the Rehabilitation Act may not serve as the basis for a § 1983 claim. While this Court agrees with defendants' position, it need not rest its holding upon this. Because this Court has previously determined that defendants did not violate either the ADA or Section 504 of the Rehabilitation Act, consequently, defendants have not violated any federal law for which 42 U.S.C. § 1983 can provide redress. Accordingly, this Court grants defendants' Motion for Summary Judgment on the claim based on 42 U.S.C. § 1983.[18]

### CONCLUSION

This dismissal of plaintiff's law suit must come as another disappointment to a person who has had more than his share of undeserved disappointments in the last few years. The Court's decision that the defendant's actions do not violate federal law does not diminish its sincere regret at the unfortunate accident that plaintiff suffered or its admiration for the courage that plaintiff has demonstrated in the aftermath of the accident.

---

**18.** Although not argued by defendants, this Court also finds no evidence in the record before it to indicate that the City of Alpharetta had a policy, custom or practice of violating the ADA or Section 504 of the Rehabilitation Act. In order to impose liability on a municipality such as the City of Alpharetta, the plaintiff must provide evidence that the City had such a discriminatory policy, custom or practice. *See Monell v. Dept. of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). As no such evidence has been presented to the Court, this Court finds that this is an alternate ground for granting summary judgment to the defendants on this claim.

While he was employed by the police department, plaintiff was apparently a hard working and willing employee. After the accident, Mr. Holbrook could have sought a disability release or could have gladly accepted the reduced assignments given to him as a result of his severe vision impairment. Instead, he sought to perform all the duties that he had performed prior to his accident, when the performance of some of those duties clearly must have presented real challenges and hardship to him. That he wanted to work just as he had in the past speaks volumes about plaintiff's tenacity, diligence, and courage. That his employer did not share plaintiff's optimism about his ability to perform some of these functions, however, does not render the employer in violation of the ADA or the Rehabilitation Act.

For all the foregoing reasons, defendants' Motion for Summary Judgment is **GRANTED.**

SO ORDERED.