Edward B. **OVERTON**, Plaintiff–
Appellant,

v.

William K. **REILLY**, Administrator, Environmental Protection Agency, and United States Environmental Protection Agency, Defendants–Appellees.

No. 91–3186.

United States Court of Appeals,
Seventh Circuit.

Argued April 30, 1992.
Decided Oct. 22, 1992.

James C. Schroeder, Vincent J. Connelly, Kathleen Gorr (argued), Mayer, Brown & Platt, Chicago, Ill., for plaintiff-appellant.

Linda A. Wawzenski, Asst. U.S. Atty., Madeleine S. Murphy, Asst. States Atty., Fred Foreman, U.S. Atty., Office of the U.S. Atty., Criminal Div., Chicago, Ill., for defendants-appellees.

Before CUDAHY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Edward Overton brought a claim against the United States Environmental Protection Agency (EPA) under sections 501 and 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 & 794 *et seq.* (1988). Overton claims that the EPA fired him because of his handicap. The district court granted summary judgment for the EPA, and we reverse.

## I.

We review a grant of summary judgment *de novo*, and must take the facts in the light most favorable to the non-movant. *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1084 (7th Cir.1992). The following account, drawn from the briefs, the memorandum opinion of the district court and the record, presents the facts of the case from Overton's point of view.

Overton lacks a finger on his left hand, but the missing finger does not hold him back much. Overton is somewhat disabled, however, by an emotional illness, which appears to put a strain on his contacts with other people. Despite a long history of mental illness, which includes severe bouts of depression,[1] in 1985 Overton managed to graduate from the University of Illinois at Chicago with a B.S. in Chemistry. Upon graduation, the Illinois Department of Rehabilitation Services (DORS) recommended that Overton apply for a job with the EPA, which had a Disabled Persons Program. DORS notified Seth Diblee, the head of the Program, that Overton had personal and emotional problems and took a small amount of medication to control tension. The DORS letter concluded, however, that Overton's disability would not interfere with his performance as a chemist.

Diblee referred Overton to Gregory Parker, the (then) Chief of the Underground Injection Control Section of the EPA for Region V, based in Chicago. Parker offered Overton a job with the permit unit of his section. According to Parker's deposition testimony, he hoped that a chemist would add to the overall expertise of the Permit Unit staff, which consists mostly of geologists. Parker did not know that Overton would have difficulty communicating with the public. On the other hand, Parker and Overton did not discuss public contact, and Overton was under the impression that the job did not require any. Overton's job description states that personal contacts "primarily include employees in the agency, both inside and outside the immediate office, including higher-grade staff, professionals and support staff." Overton App. at 68. It makes no mention of contacts with the public.

Soon after he started work in December 1985, Overton began to have trouble with the new supervisor of the Permit Unit, Valerie Jones. Overton admits to falling asleep at his desk during his first week, when he had nothing to do and his medication made him drowsy. Jones claims,

---

1. "Depression" is a misleadingly mild term for an extraordinarily debilitating illness. *See* William Styron, *Darkness Visible: A Memoir of Madness* (Random House 1990).

and Parker also stated, that Overton slept on the job rather more often. Larger troubles arose in January 1986, however, when Jones announced that all of the members of the Permit Unit technical staff would have to write permits—an activity that requires some amount of communication with permit applicants. Shortly after this announcement, Overton informed Jones that his emotional problems made personal contact with members of the public difficult for him, if not impossible. Overton asked that his job be restructured so that he could avoid using the telephone and meeting with permit applicants in person. He also asked for more assignments that would require use of his knowledge of chemistry. According to Diblee and Overton, Jones refused even to consider making accommodations along these lines. Jones herself testified that her response was to suggest that Overton seek another position within the agency.

In subsequent performance reviews, Jones criticized Overton for his "inability to communicate effectively with the regulated community." Dep. of Valerie Jones at 61 (Dec. 19, 1990). The reviews also report that Overton continued to sleep on the job and that he was having difficulty with the technical aspects of permit writing.

Despite these negative reviews, there is evidence that Overton was at least trying hard. Although there were eleven or twelve members of the Permit Unit technical staff, Overton completed 25 percent of the Unit's file reviews (apparently a dirty job that other employees avoided). Overton also completed 42 permits, approximately 20 percent of those completed by the Unit as a whole.

There is also evidence that Overton was doing acceptable work. During 1986, Parker took Overton under his wing: he reviewed Overton's work, talked to him frequently and asked him to perform a substantial research project. According to Parker, Overton showed progress in learning to write permits. Although Overton made mistakes, they were not that serious, nor were they unexpected in light of Overton's lack of geological expertise. Parker

opined that Overton was better than other permit writers of his acquaintance who had substantially more experience.

Overton sent the results of his research project to Mario Salazar, a member of the EPA's technical staff in Washington, for peer comments. Salazar commended Overton's paper and sent it to other managers in his office, with the suggestion that the relevant regulations be amended. When Jones saw the paper, however, she disagreed with Overton's conclusions and criticized him for circulating the paper outside of proper channels.

As early as February or March 1986, Jones told Parker that Overton should not be in the Permit Unit because he lacked a geotechnical background and because of his psychological problems. In October 1986, Jones gave an unfavorable evaluation of Overton's performance for fiscal year 1986. She cited the inordinate amount of supervision Overton required, his failures to communicate and his lack of progress in understanding the technical aspects of the permit process. Following the negative review, Jones fired Overton as of December 1986. Overton filed an internal complaint, exhausted his administrative remedies and then sued.

One more set of facts is worth noting. In September 1985, before he was hired by the EPA, Overton applied for disability benefits. When he started work at the EPA, Overton notified the Social Security Administration (SSA) that he had taken gainful employment. In January 1986, the SSA determined that Overton was eligible for disability benefits, based on his emotional handicap. Given his employment status, the SSA awarded benefits on a nine-month trial basis. When Overton found out that he would be terminated, in October 1986, Overton notified the SSA, which continued his benefits.

On the EPA's motion for summary judgment, Judge Parsons concluded that there was no genuine issue that Overton was not "otherwise qualified" for his position. Mem.Op. and Order at 16 (July 9, 1991) (Mem.Op.). The EPA had made every "reasonable accommodation" for Overton's

handicap; Overton had presented no evidence that he "could have performed the essential functions of any position"; and Overton's suggested accommodations were unreasonable in that they required the EPA to manufacture a new position for him. *Id.* at 14–15.

## II.

■ Overton brought suit under sections 501 and 504 of the Rehabilitation Act of 1973. 29 U.S.C. §§ 791 & 794. The district court treated Overton's claim as one brought solely under section 504. Mem. Op. at 1. To compound the confusion, we have expressed some doubt that section 504 applies to employment discrimination suits against federal agencies. *McGuinness v. United States Postal Service,* 744 F.2d 1318, 1321–22 (7th Cir.1984); *see also Johnson v. United States Postal Service,* 861 F.2d 1475, 1477 (10th Cir.1988), *cert. denied,* 493 U.S. 811, 110 S.Ct. 54, 107 L.Ed.2d 23 (1989); *Boyd v. United States Postal Service,* 752 F.2d 410, 413 (9th Cir. 1985) (section 501 is exclusive remedy for federal employees). Other circuits, however, believe that 504 does apply. *See, e.g., Treadwell v. Alexander,* 707 F.2d 473, 475 (11th Cir.1983); *Smith v. United States Postal Service,* 742 F.2d 257, 260 (6th Cir. 1984); *Prewitt v. United States Postal Service,* 662 F.2d 292, 302–04 (5th Cir.1981) (discussing legislative history); *cf. Ristoff v. United States,* 839 F.2d 1242, 1243–44 (7th Cir.1988) (assuming without discussion that plaintiff may sue federal employer under section 504). The EPA is also in dissent from our musings in *McGuinness,* as it has promulgated regulations under section 504 that apply to its own employees. *See* 40 C.F.R. pt. 12 (1991).[2]

Neither of the parties has addressed the applicability of section 504 or the differences (if any) between a claim brought under 501 and a claim brought under 504. We need not address these questions either, since the threshold issue on which the district court granted summary judgment is identical (or at least substantially similar) under both provisions.

Section 504 authorizes discrimination suits by "otherwise qualified handicapped individual[s]." Section 501(b) is phrased in very different terms: the section says nothing about discrimination or qualifications and merely requires federal agencies to submit affirmative action plans. Nonetheless, section 505(a)(1), 29 U.S.C. 794a(a)(1) (1988), authorizes individual lawsuits against federal agencies that violate the terms of section 501. And regulations promulgated by the Equal Employment Opportunity Commission (EEOC) under section 501 make clear that federal agencies may not discriminate against "qualified physically or mentally handicapped person[s]." 29 C.F.R. § 1613.703 (1991); *see generally Langon v. Department of Health and Human Services,* 959 F.2d 1053, 1057 (D.C.Cir.1992). Thus, Overton may not maintain an action under either provision unless he is "qualified."

"Qualified" is a defined term. The EEOC polices section 501, 29 U.S.C. 791(b), and defines a qualified handicapped person as one who "with or without reasonable accommodation, can perform the essential functions of the position in question...." 29 C.F.R. § 1613.702(f) (1991). "Reasonable accommodation" is also defined:

Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible ... and (2) job

2. Courts have assumed that section 504 prohibits handicap discrimination against federal employees because it prohibits discrimination "under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a) (1988); *Prewitt,* 662 F.2d at 302 & n. 15. In 1988, Congress amended section 504 to provide a definition for "program or activity." Civil Rights Restoration Act of 1987, Pub.L. No. 100–259 § 4(2), 102 Stat. 29 (1988). Although the purpose of the amendment was to expand the coverage of the Rehabilitation Act following a re- strictive interpretation by the Supreme Court, *see DeVargas v. Mason & Hanger–Silas Mason Co.,* 911 F.2d 1377, 1383–84 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991), the extensive new definition of "program or activity" makes no reference to federal employment. As discussed in the text, *infra,* we need not decide whether the amendment changes the applicability of section 504 to federal employment practices. Accordingly, we also need not decide whether the amendment should apply retroactively if it does change the law.

restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

29 C.F.R. § 1613.704(b) (1991). These possibilities are to be balanced against considerations of "undue hardship" to the agency. *See* 29 C.F.R. § 1613.704(a) & (c) (1991).

The individual agencies police section 504 and are responsible for promulgating their own regulations. 29 U.S.C. § 794(a). This might have led to a hash of conflicting and contradictory provisions, but it did not, since the agencies have more or less copied the EEOC's regulations including its definitions of "qualified" and "reasonable accommodation." *See, e.g.,* 5 C.F.R. §§ 900.-703(e)(1) & 900.706(b)(2) (1992) (Office of Personnel Management); 29 C.F.R. § 32.3 (1991) (Department of Labor); 38 C.F.R. §§ 18.403(k)(1) & 18.412 (1991) (Department of Veterans Affairs); 45 C.F.R. §§ 84.3(k) & 84.12 (1991) (Department of Health and Human Services). The EPA took a more economical route, and simply declared that the EEOC's regulations apply directly. *See* 40 C.F.R. §§ 12.103, 12.140 (1991).

In sum, litigants must jump through the same hoops to recover under either section 501 or section 504. The plaintiff must be handicapped and qualified. To be qualified, the plaintiff must be able to perform the essential functions of his job, with or without reasonable accommodation by his employer.

The only potential difference between sections 501 and 504 is the burden of persuasion on the issue of "reasonable accommodation." Other circuits have held that under section 501 the burden of proof is on the government to show that a proposed accommodation is unreasonable. *Langon,* 959 F.2d at 1061; *Gardner v. Morris,* 752

F.2d 1271, 1280 (8th Cir.1985); *Treadwell,* 707 F.2d at 478; *Prewitt,* 662 F.2d at 308, 310 (full discussion of shifting burdens). Actions under section 504, on the other hand, may require the plaintiff to show that a proposed accommodation is reasonable, although the case law on this issue is, to say the least, complex. *Compare Doe v. New York Univ.,* 666 F.2d 761, 775–77 (2d Cir.1981) *with Pushkin v. Regents of Univ. of Colo.,* 658 F.2d 1372, 1386–87 (10th Cir. 1981); *see also Wynne v. Tufts Univ. Sch. of Medicine,* 932 F.2d 19, 22–26 (1st Cir. 1991) (en banc) (questioning *Doe* ). The apparent differences may be justified by the obligation of the government to undertake affirmative action on behalf of the handicapped under section 501, an obligation that section 504 does not impose. *Southeastern Community College v. Davis,* 442 U.S. 397, 410–13, 99 S.Ct. 2361, 2369–71, 60 L.Ed.2d 980 (1979); *Hall v. United States Postal Service,* 857 F.2d 1073, 1077 (6th Cir.1988).[3] We need not allocate the burden of proof here, however, for we conclude that summary judgment was inappropriate even if Overton bears the burden of proof on this issue.[4]

### III.

We turn now to the central issue in this case: Is there a genuine question of fact whether Overton is "otherwise qualified" for his position?

### A. Communicating with the "Regulated Community"

Overton concedes that his disability prevents him from communicating effectively with applicants for injection well permits. The EPA contends that such communication is an essential function of Overton's job. Since he cannot perform that function, the EPA argues, Overton is not qualified for his position.

---

**3.** On the other hand, the different formulations of the burden of proof may also be due to differing fact patterns, rather than the different statutory provisions involved. *See Doe v. New York Univ.,* 666 F.2d at 776 (allocation of burdens may depend on whether the employer relies on the handicap expressly, or claims to have acted on another basis).

**4.** We trust that the parties will spend some time after remand to flesh out the issues we have raised.

There is a genuine question here, however, whether contact with the public is an essential function of Overton's job. Public contact was not part of Overton's official job description, either when he was hired or when Jones announced that all technical staff would have to write permits. *See Davis v. Frank*, 711 F.Supp. 447, 453 (N.D.Ill.1989) (job description is relevant to determination of essential functions of position). Overton also presented evidence that Kris Kamath, another member of the Unit's technical staff, does not have any contact with the public, despite the mandate from Jones. As the district court pointed out, Kamath has better educational credentials than Overton, Mem.Op. at 15, but that does not mean that Overton is necessarily unqualified to perform similar tasks in the Permit Unit.

Even if contact with the public is an essential function of Overton's job, there is evidence to suggest that Overton could perform that function with reasonable accommodation by the EPA. First, even if contact is essential, the job does not require much of it: Parker testified that about five percent of Overton's job involved public contact. And there does not seem to be any question that Overton is capable of corresponding with permit applicants by mail. To the extent that telephone contacts are required, it may be reasonable for the EPA to provide Overton with someone to talk for him, just as it might be a reasonable accommodation for the EPA to provide an interpreter for an employee who was deaf. *See* 29 C.F.R. § 1613.704(b)(2) (1991). Overton has also suggested that his job be restructured; he could perform support functions for members of the staff who are better on the telephone. This proposal does not seem inherently unreasonable. *See id.*

At trial, these potential accommodations may turn out to be unduly burdensome on the EPA, but we cannot say that the agency has presented evidence sufficient to make the conclusion inevitable.

### B. *Sleeping on the Job and Poor Performance*

Putting contacts with the public aside, the EPA presented substantial evidence to the district court that Overton's overall performance was unacceptably poor. But here, too, there are genuine issues of fact. Overton denies that he slept as much as Jones alleges. He has also presented evidence that his sleepiness is a side effect of his medication. Further, there is evidence that, even if Overton slept as much as Jones alleges, he still got his work done. Supervisors are prone to view catnaps as inappropriate and unprofessional, but if Overton's sleepiness is a *function of his disability* (or, more properly, of the treatment for his disability) and he can still perform the essential functions of his job, then he may still be viewed as "qualified" under the Rehabilitation Act.[5]

The EPA also presented some evidence that Overton required an inordinate amount of supervision. But again there was countervailing evidence—the deposition testimony of Gregory Parker that Overton made mistakes typical of a new permit writer and was improving. Some of Overton's problems with writing permits may be due to his lack of a geotechnical background. Parker may have made a mistake when he hired a chemist for the Permit Unit staff. But, again, we cannot say that there is no question about Overton's qualification for his job.

At this point we should emphasize that we have addressed only the threshold issue of Overton's qualification for his position. Nothing in section 504 of the Rehabilitation Act, however, requires a federal agency to retain every minimally qualified handicapped employee. Further, "the Rehabilitation Act requires only a stereotype-free assessment of the person's abilities and prospects rather than a correct decision."

---

5. We do not mean to condone promiscuous napping. Some positions may actually require full-time vigilance. Every position presumably requires wakefulness for most of the working day and at specified events. In any event, the government may presumably require its employees to stay awake as a matter of decorum. But that is not necessarily to say that an occasional nap would make any federal employee unfit.

*Anderson v. University of Wisconsin,* 841 F.2d 737, 747 (7th Cir.1988) (interpreting section 504); *Carter v. Casa Central,* 849 F.2d 1048, 1053 (7th Cir.1988). Section 501 may impose somewhat greater obligations to take affirmative action, but again we need not decide. If section 504 standards apply, however, Overton will have to establish at trial not only that he was qualified, but also that Jones fired him because of his handicap. Although the district court does not appear to have ruled on this point in granting summary judgment, we note that Overton presented evidence from which one could infer that Jones did so.

### C. *Total Disability*

The district court was greatly impressed by the finding of the Social Security Administration that Overton was entitled to disability benefits. Overton, the court said, had "failed to offer any evidence to refute the conclusion drawn by the Social Security Administration that he is 'unable to perform any substantial gainful activity.'" Mem.Op. at 15–16. But the evidence that Overton completed a large number of file reviews and permits, that his work was adequate and that his research paper was well received does tend to show that Overton was able to carry on substantial gainful activity.

 Further, even if a finding of disability could have preclusive effect in a private lawsuit,[6] such a finding is consistent with a claim that the disabled person is "qualified" to do his job under the Rehabilitation Act. First, the SSA may award disability benefits on a finding that the claimant meets the criteria for a listed disability, without inquiring into his ability to find work within the economy. *Garfield v. Schweiker,* 732 F.2d 605, 607 n. 2 (7th Cir.1984). As it turns out, the SSA granted benefits to Overton on this basis. Second, even if the SSA had looked into Overton's ability to find work in the national economy, its inquiry would necessarily be generalized. The SSA may determine that a claimant is unlikely to find a job, but that does not mean that there is no work the claimant can do. In sum, the determination of disability may be relevant evidence of the severity of Overton's handicap, but it can hardly be construed as a judgment that Overton could not do his job at the EPA.

### IV.

Overton has presented evidence sufficient to create a genuine question whether he was qualified for his position. Accordingly, the judgment of the district court is REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.

---

**6.** Judge Parsons did not give the disability determination preclusive effect, and the EPA does

not argue that we should.