Tommie JOHNSON, Plaintiff,

v.

**GEORGIA DEPARTMENT OF HUMAN RESOURCES, Cecilia Jackson, in her individual and official capacities, Carol Culbreath, in her individual and official capacities, and Marie Elder, in her individual and official capacities, Defendants.**

No.  CIV. 1:94–CV–3161–JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 9, 1996.

Carl Anthony Cunningham, Office of Carl Anthony Cunningham, Decatur, GA, for Plaintiff.

Michael J. Bowers, Jeff L. Milsteen, Office of State Atty. Gen., Atlanta, GA, Kattegummula Prabhaker Reddy, Office of K. Prabhaker Reddy, Decatur, GA, for Defendants.

## *ORDER*

CARNES, District Judge.

This case is presently before the Court on defendant's Motion for Summary Judgment [25]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's motion should be **GRANTED.**

## *BACKGROUND*

On March 1, 1993, plaintiff was hired as a "caseworker senior" by the Fulton County Department of Family & Children Services (hereinafter "DFACS"), an arm of defendant Georgia Department of Human Resources (hereinafter "GDHR"). Plaintiff is legally blind, a recognized disability under the

Americans with Disabilities Act. He was hired through the Alternative Employment Program (hereinafter "AEP"), a state sponsored program. AEP is a division of the GDHR. The AEP provides an alternative route for disabled applicants seeking employment with the state. (See Deposition of Gail B. Moore (hereinafter "Moore Depo.") at 6.) It is administered by the Division of Rehabilitation Services (hereinafter "DRS").

Pursuant to the program, plaintiff underwent a functional assessment for the position of caseworker senior and a job analysis was conducted. Plaintiff met the "knowledge, skill and ability criteria" of the Merit System and was deemed qualified for the job. (Moore Depo. at 5–7.)

Plaintiff's twelve month "working test" period began on his first day, March 1, 1993. (Affidavit of Cecilia Jackson (Hereinafter "Jackson Aff."), attached to Def. Mot. for Sum. J. [25] at Ex. 1, ¶ 2.) The working test period is used to evaluate an employee before he or she obtains permanent status. Accordingly, prior to the attainment of permanent status, an employee may be terminated for any reason.

On or about August 19, 1993, after the completion of his training, plaintiff was assigned to the South Fulton DFACS to process claims for ongoing food stamp benefits. Defendant Jackson was his immediate supervisor.

Plaintiff's position required him to schedule and interview current food stamp recipients. As part of his duties, plaintiff reviewed claimants' verification forms, evaluated eligibility based on food stamp guidelines, and processed the information via computer. Plaintiff was also responsible for maintaining all documents and computer records in each claimant's file. (Jackson Aff. at Ex. 1, ¶ 3.)

During the period between August 1993 and December 1993, plaintiff's caseload consisted of roughly 200 claimants. (Deposition of Tommie Johnson (hereinafter "Johnson Depo.") at 142.) This caseload was substantially less than that of other caseworker seniors. (Deposition of Cecilia Jackson (hereinafter "Jackson Depo.") at 41–42.) Defendants contend that plaintiff failed to complete his work timely and accurately. Accordingly, defendants terminated plain-

tiff's employment with DFACS on December 21, 1993, effective December 31, 1993. Plaintiff was still in his working test period.

On January 21, 1994, plaintiff filed a complaint with the Georgia Commission on Equal Opportunity (hereinafter "CEO") alleging that defendants dismissed him in violation of the Americans with Disabilities Act. He received a "right to sue" letter on August 8, 1994. (See Def. Mot. for Sum. J. [25] at Ex. 8.)

Plaintiff, also subsequent to his discharge, applied for and has received disability benefits from the Social Security Administration. He stated on his application, dated February 17, 1994, that he had a disabling condition which rendered him unable to work as of January 1, 1994. (See id. at Ex. 6.)

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. at 2552–53; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54. After the movant has carried his

burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[1] designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. at 2510. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. at 2510–11. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

### II. Plaintiff's § 1983 Claims

Plaintiff has abandoned his claim based on 42 U.S.C. § 1983 asserted against defendant

GDHR, and defendants Jackson, Culbreath, and Elder in their individual and official capacities. (*See* Pl. Resp. to Def. Mot. for Sum. J. [28] at 3.) Accordingly, the only claim that remains is plaintiff's ADA/Rehabilitation Act claim against defendant GDHR.

### III. Plaintiff's ADA Claim/Rehabilitation Act claim

In order to establish a prima facie case of disability discrimination under the Americans with Disabilities Act (hereinafter "ADA") or Section 504 of the Rehabilitation Act,[2] a plaintiff must show that: (1) he or she is disabled as defined under the ADA; (2) he or she is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) because of such disability, the defendant employer terminated his or her employment. *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092, 1099 (S.D.Ga. 1995) (citing *White v. York Int'l Corp.,* 45 F.3d 357, 360–61 (10th Cir.1995)). Before examining whether plaintiff has met his burden, the Court will address defendant's estoppel argument.

### A. Is plaintiff estopped?

■ Defendant argues that plaintiff is estopped from bringing an ADA/Rehabilitation Act claim, as he filed an application with the Social Security Administration (hereinafter "SSA") representing that he was "unable to work [as of January 1, 1994, the day after his last day of employment] because of [his] disabling condition." (Def. Mot. for Sum. J. [25] at 9; *See also* Ex. 6.) It cites numerous cases in support of the argument that where a plaintiff asserts on an application for disability benefits that he or she is totally disabled and, as a result, unable to work, he or she is barred from simultaneously asserting that he or she was qualified to perform the essential functions of the position he had held. *See, e.g., Fussell v. Georgia Ports Authority,* 906 F.Supp. 1561, 1575 (S.D.Ga.1995)

---

1. The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

2. As this Court has previously recognized: "'The standards used to determine whether [the Reha-

bilitation Act] has been violated in a complaint alleging employment discrimination ... [are] the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.)....'" *Holbrook v. City of Alpharetta,* 911 F.Supp. 1524, 1536 n. 12 (N.D.Ga.1995) (Carnes, J.) (citing 29 U.S.C. § 794(d)).

(finding that plaintiff was barred from bringing ADA claim after having represented that he was disabled for purposes of obtaining government benefits); *Ricks v. Xerox Corp.,* 877 F.Supp. 1468, 1477 n. 9 (D.Kan.1995) (noting that plaintiff should be estopped from claiming she was a qualified individual where she previously represented she was disabled). *See also McNemar v. The Disney Stores, Inc.,* 1995 WL 390051 (E.D.Pa. June 30, 1995) (same); *Nguyen v. IBP, Inc.,* 905 F.Supp. 1471, 1483–85 (D.Kan.1995) (same); *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 555 (D.Kan.1995) (same).

In *Fussell,* the plaintiff had a "benign essential tremor," which prevented him from being able to fire a weapon accurately. *Fussell,* 906 F.Supp. at 1567. After being terminated from the Georgia Ports Authority because he was unable to perform this essential function, plaintiff applied for disability benefits. Drawing on cases like *Ricks v. Xerox Corp.,* the district court in *Fussell* determined that, if it could be shown after further discovery that the plaintiff swore to an oath, for purposes of obtaining Social Security benefits, that he was permanently disabled, he would be estopped from asserting his ADA claim. *Id.* at 1575–76. The court reasoned that if plaintiff had made the unequivocal representation that he was "[a] hundred percent" disabled within the meaning of the Social Security Act, and was thereby deemed unable to work, he should not be permitted to turn around and claim that he was a qualified individual with a disability, for purposes of an ADA suit against his former employer. *Id.* at 1576. The Court finds this reasoning sound and in accord with public policy.

Applied to the present case, the Court finds that plaintiff should be estopped. Plaintiff filled out a form for social security disability benefits on February 17, 1994. In response to the question: "When did you become unable to work because of your disabling condition?" he wrote "1/1/94," the day after his last day of employment. (*See* Def. Mot. for Sum. J. [25] at Ex. 6.) This is indeed a representation of being unable to work which is contradictory to the assertion that he is qualified to perform the essential functions of a caseworker senior.

Plaintiff, in opposing defendant's argument, cites several other cases that suggest that such a representation is not an automatic or absolute bar to the pursuit of an ADA or Rehabilitation Act claim. For example, plaintiff refers the Court to, *inter alia, Overton v. Reilly,* 977 F.2d 1190 (7th Cir.1992), *Kupferschmidt v. Runyon,* 827 F.Supp. 570 (E.D.Wis.1993), *Lawrence v. United States ICC,* 629 F.Supp. 819 (E.D.Pa.1985), and *Smith v. Dovenmuehle Mortgage, Inc.,* 859 F.Supp. 1138 (N.D.Ill.1994). The Court specifically finds *Overton* not directly on point and finds the other cases distinguishable.

The Seventh Circuit has taken the position that determinations of the Social Security Administration "can hardly be construed as a judgment that [the plaintiff] c[an] not do his job...." *Overton v. Reilly,* 977 F.2d 1190, 1196 (7th Cir.1992). In so concluding, the *Overton* Court noted that "the SSA may award disability benefits on a finding that the claimant meets the criteria for a listed disability without inquiring into his ability to find work within the economy." *Id.* at 1196 (citing *Garfield v. Schweiker,* 732 F.2d 605, 607 n. 2 (7th Cir.1984)). The court found that the SSA had done exactly that, with regard to that plaintiff's application.

■ This court agrees with the Seventh Circuit's analysis with regard to the basic proposition that SSA determinations, by themselves, are not conclusive on the question of whether a plaintiff suing for a violation of the ADA has established either the existence of a disability or the ability to work with a reasonable accommodation. After all, the SSA's determination is nothing more than the opinion of a third party as to the ultimate issues to be determined in the ADA action.

Defendant's argument does not require the Court to give effect to the opinion of a third party, however. Instead, defendant argues that by admissions voluntarily made in seeking Government benefits—that he was unable to work because of a disability—plaintiff, whose condition has not changed since that admission, is estopped from now asserting that he would have been able to work, notwithstanding this disability. On this latter issue, the *Overton* Court was silent, ap-

parently not having been squarely presented with the issue of whether the plaintiff's claim was precluded. Moreover, that court did not address what representations, if any, the plaintiff had made in order to obtain benefits. Thus, the Court finds that, while *Overton's* basic premise is sound, that case is not dispositive of the issue of claim preclusion based upon a plaintiff's representations,[3] as it is the plaintiff's representations that are the most important consideration in determining whether he or she should be estopped.

The Court finds *Smith,* another case upon which plaintiff relies, distinguishable from this case and unpersuasive. In that case, the plaintiff was HIV positive. The court noted that the nature of the plaintiff's disability was such that there could be improvements over time. *Smith,* 859 F.Supp. at 1142. Thus, the court concluded, the representation that one is unable to work because of a disability for benefits purposes, does not necessarily contradict the later assertion, in an ADA claim, that one is currently able to perform the essential functions of the previously held position or work in a new position. *Smith,* 859 F.Supp. at 1142. The court, therefore, did not bar the plaintiff from seeking redress pursuant to the ADA/Rehabilitation Act. *Smith,* 859 F.Supp. at 1142.

Plaintiff has not asserted that his condition could improve over time or that the effects of his disability fluctuate, as with a plaintiff who has been diagnosed with AIDS. There is no room, therefore, for the possibility that plaintiff's representation to the SSA is anything but contradictory to the position he takes with regard to the pending discrimination claims.

Moreover, the Court finds the reasoning of *Smith,* even under the differentiating circumstances, problematic. In order to state a claim under the ADA, a plaintiff must first be able to show that he or she was qualified to perform the essential functions of the relevant position with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8). A court must determine, therefore, whether, *at the time of the discharge,* the plaintiff could meet the requirements of his position. Courts do not generally inquire whether the plaintiff could perform those duties at some later date, such as when the lawsuit was filed.

The *Smith* court appears to give this essential component of an ADA claim analysis short shrift, however. Its ruling begs the question of how a plaintiff can claim to be disabled, essentially at the time of firing (or one day later), and maintain a suit which impliedly asserts that he or she was actually qualified to perform the essential functions of his position. In *Smith,* the plaintiff filed for disability insurance and represented to the SSA that he was unable to work as of one day after his discharge. He later brought suit against his former employer ostensibly claiming that, although he was qualified to perform the essential duties of his job, the defendant corporation fired him because of his disability in violation of the ADA. *Smith,* 859 F.Supp. at 1140.

The court, in denying defendant's motion for summary judgment, held that plaintiff's positions were not necessarily contradictory, because it was entirely possible that his condition had improved between the time he filed for disability benefits and the *time of the lawsuit. Id.* While it may be true that plaintiff's condition did indeed improve, the court seemed to overlook the fact that the relevant date for determining whether plaintiff was qualified to work is the date he was discharged. Closeness in time of the claim of disability to the date of discharge should prompt immediate concern regarding the plain inconsistency between the statement made when applying for disability benefits and a totally contradictory position concerning the applicant's condition and abilities on the immediate preceding day.

In short, the basis of a claim of disability discrimination is a showing that, although the plaintiff was able to perform his job duties adequately, he was fired because he had a disability. The basis for a claim of disability

---

**3.** *Kupferschmidt* similarly stands for the proposition that the determination by a government agency that an individual is unable to work is not conclusive. *Kupferschmidt,* 827 F.Supp. at 574. That case likewise does not deal directly with the issue of the representations made by the plaintiff in order to qualify for such benefits and is not dispositive for the same reasons that *Overton* is not dispositive.

benefits is that the claimant is unable to perform his job. Thus, in this Court's opinion and in the opinion of other courts applying the logic of cases like *Fussell,* a plaintiff who advocates two such sharply contradictory positions should be estopped from later asserting that he was qualified to perform his job. Under that logic, plaintiff should be estopped from now claiming that he was qualified to perform his job.

■ Plaintiff resists such a conclusion, arguing that such a rule makes him choose between his right to federal benefits and his right to pursue an ADA claim and, accordingly, should be against public policy. The Court is sympathetic to the situation plaintiff faced at the time of his discharge and recognizes that job opportunities for those with severe visual impairments are not in abundance and that bills must be paid. Yet, it would seem that Plaintiff likely could have applied for other benefits, such as unemployment compensation; such benefits would have assisted him while he looked for other employment without resulting in his having to make inconsistent representations concerning his ability to work. Even were there no other benefits available, a person is accountable for his representations and will not be permitted to "speak out of both sides of h[is] mouth with equal vigor and credibility before this court." *Reigel v. Kaiser Foundation Health Plan of North Carolina,* 859 F.Supp. 963, 970 (E.D.N.C.1994). *See also, Fussell,* 906 F.Supp. at 1576 (quoting *McNeill v. Atchison, Topeka & Santa Fe Ry. Co.,* 878 F.Supp. 986, 990–91 (S.D.Tex.1995)) (internal quotation marks omitted) (emphasis in original) ("It was not the objective of the ADA, nor the intent of this Court, to facilitate, and ensure double recoveries. . . .").

Indeed, from a public policy perspective, the concern about double recoveries, articulated in *McNeill,* is a real one. A successful ADA plaintiff who receives three years of back pay from an employer who has earlier discharged him, in addition to Social Security disability benefits for that same period of time, will have received an undeserved windfall, with the source of part of that windfall being a federal program with dwindling resources. The Court has not been directed to anything in the Social Security Act or in the

ADA that would allow any set-off for the double recovery.

Further, both Social Security disability claims and ADA claims require litigation and the expenditure of scarce judicial and administrative resources in pursuing claims whose factual predicates are inherently contradictory. The better public policy would appear to be one that requires the potential claimant to honestly and intelligently analyze his situation before unselectively filing every type of claim potentially available to him. Thus, does the claimant conclude that he is so disabled that finding employment would appear to be an unlikely accomplishment? If so, that claimant is the person for whom the Social Security disability program was intended. If the claimant, however, concludes that while he has some impairments, these impairments, with reasonable accommodations, should not eliminate his ability to find satisfactory employment, then this claimant should not be applying for disability benefits, but instead should either consider suing his former employer or finding another job during the time he is collecting unemployment benefits.

Accordingly, the Court believes that plaintiff should be estopped from this ADA suit and that it should be an independent ground for granting summary judgment. Nevertheless, because there is no controlling circuit level law on this issue and because the Court is mindful of the harsh choice that plaintiff felt he faced at the time he applied for disability benefits, the Court has also analyzed this case as if there were no estoppel issue. Having done so, the Court concludes that, on the merits, defendant's motion for summary judgment should be granted for the reasons that follow.

### B. *Plaintiff's prima facie case*

In order to pursue a claim under either the Americans with Disabilities Act (hereinafter "ADA") or Section 504 of the Rehabilitation Act, a plaintiff must demonstrate that he is a "qualified individual with a disability" or "otherwise qualified" for the position that he held or desired. 42 U.S.C. § 12112(a); 29 U.S.C. § 794(a). Defendant readily concedes that plaintiff has a disability. It argues,

however, that plaintiff was not qualified to perform the position for which he was hired. To be considered a qualified individual, plaintiff must be able to perform the essential functions of his position, with or without reasonable accommodation. 42 U.S.C. § 12111(8).

█ A reasonable accommodation should impose no undue hardship on the employer. Moreover, an employer is only required to make a reasonable accommodation when such accommodation will enable the employee to perform the essential functions of the job. If the employee is still unable to perform the essential functions of the position, the employer is under no obligation to eliminate or reallocate any of the job's essential functions. *Holbrook v. City of Alpharetta,* 911 F.Supp. 1524, 1536 (N.D.Ga.1995) (Carnes, J.) (citing *Larkins v. CIBA Vision Corp.,* 858 F.Supp. 1572, 1583 (N.D.Ga.1994) (Evans, J.)). *See also, Reigel,* 859 F.Supp. at 973 (holding that alternatives proposed by plaintiff were not reasonable because they eliminated essential functions of job).

The functions at issue in the present case appear to be filing and reading cursive writing on the verification forms submitted by the claimants. (*See* Johnson Depo. at 60, 90.) Plaintiff concedes that he is unable to perform these tasks without assistance. He argues that these functions are not essential and, as a reasonable accommodation, defendant should have reallocated them to other workers (i.e. do the filing and help him read) (Johnson Depo. at 54–55, 58–59, 60, 90.). Defendant, in contrast, contends that these tasks are essential, that it is not required to reallocate essential duties to other employees and that the accommodation plaintiff requests is unduly burdensome and not reasonable.

### 1. *Are the functions essential?*

█ The Court must first determine whether the duties at issue were essential to performing the job of caseworker senior. The statutory regulations provide the basis for the analysis. They state that the initial inquiry into whether a function is essential focuses on whether the employer "actually requires employees in the position to perform the functions that the employer asserts are essential." 29 C.F.R. Pt. 1630, App. § 1630.2(n).

Defendant Jackson, plaintiff's immediate supervisor at DFACS, states in her affidavit:

The requirements for this position require a caseworker senior to schedule and interview claimants who are receiving food stamp benefits. In interviewing the claimant, a caseworker senior is required *to review the verification form submitted by the claimant. A caseworker senior then reviews the information,* and applies food stamp eligibility policy to determine whether the claimant will be recertified (benefits extended or denied) for receipt of food stamps. A caseworker senior is then required to complete the necessary forms and process this information through the computer. *Each caseworker is required to maintain the files for each claimant and file all documents and computer generated information in the claimant's file.*

(Jackson Aff. at ¶ 3 attached to Def. Mot. For Sum. J. (25) (emphasis added).) The duties of reading and filing are explicitly stated requirements of the position. It is not disputed that the other caseworker seniors perform those functions, as required.

Having answered the first question in the affirmative, the regulations posit a second: [Will] "removing the function [ ] fundamentally alter that position?" 29 C.F.R. Pt. 1630, App. § 1630.2(n). Factors to be considered include: (1) whether the reason the position exists is to perform that function; (2) whether there are a limited number of employees available among whom the performance of that job function can be distributed; and/or (3) whether the function is highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function. *See* 29 C.F.R. § 1630.2(n), App. § 1630.2(n).

#### a. *Reading*

In this case, plaintiff does not request that the function of reading be entirely eliminated. Apparently, plaintiff can read some writing on documents; on other documents, however, because of the style of handwriting, plaintiff cannot read these documents. With regard to those documents that he cannot read, plaintiff must find another employee, interrupt that employee from his regular

duties, and have that employee read the documents to him in order that he can perform his assigned task with regard to that particular claim. The relevant inquiry, therefore, is whether the position will be fundamentally altered if *part of* the reading function were removed—i.e. having someone read to plaintiff those documents that he cannot read.

The purpose of the job position is to ensure that *food stamp claimants are receiving* the proper aid and to prevent an abuse of the system through ongoing monitoring. To perform that function, a caseworker senior must be aware of the information pertinent to achievement of the above goals. Because this information is communicated largely in a written format, one has to be able to read to gain the relevant information from the submitted documentation in order to fulfill the purpose of the job. Accordingly, as to the first factor of the suggested regulatory guidelines, the reason the position exists is to perform that function: reading.

With regard to whether there are a limited number of employees available to handle reassigned duties that the plaintiff cannot perform, there were between five to eight caseworker seniors at any given time. (*See* Jackson Depo. at 6.) Because each caseworker senior has to perform the same functions as plaintiff, and indeed they were assigned larger case loads, there are, in fact, a limited number of employees available among whom the performance of the job function can be distributed. Neither party has given an indication of how often plaintiff would need someone else to read documents to him, or the average length of time taken to read a particular record. No matter how infrequently or how long plaintiff needed assistance, though, another worker's schedule would necessarily be disrupted if he or she had to assist with the task of reading documents. Moreover, defendant can neither control nor predict which documents will be handwritten in a style that is readable to plaintiff.[4] Thus, plaintiff will have to intermittently interrupt other workers throughout the day to help him. If a co-worker or volunteer is unable to assist at that moment, then plaintiff will ostensibly have to go on to something else—making him less productive, as he will be halted in one case and have to switch gears to work on another.

Plaintiff was hired to determine whether an applicant was entitled to food stamps. To do so, he had to be aware of the information contained in the applicant's supporting documentation. Although he was not hired for his particular expertise in reading, he was hired for his ability to interpret documents, which calls for the ability to read or some way to comprehend what is printed on the page.[5]

---

**4.** Caseworkers are responsible for verifying that food stamp applicants are still eligible for assistance. They must be able to review all documents submitted by the food stamp applicant in support of his or her continuing eligibility. Some documents, like utility bills and leases, are *computer generated.* Other documents, like pay stubs or verification notes from family members or friends in the household, are handwritten. (*See, e.g.,* Jackson Depo. at 16 ("If a person had a family member or a friend contributing to their household, that person may write a statement, … we do have a contribution form that could be given, but if that person brought in a statement that Joe Blow was giving me $25 to maintain my household, that may have been handwritten.")) The clarity of the handwriting present on some supporting documentation is uneven and, thus, while plaintiff was apparently able to make out some handwriting, he could not decipher others and had to have someone read out loud to him. For example, plaintiff testified as follows:

> Q [by Ms. Newell]: In doing your day-to-day duties at DFACS, did that entail working with various documents, forms, letters? You mentioned check stubs. You would have to deal

with paperwork on a daily basis, I would assume; is that correct?
> A: Yes.
> Q: Were you able to work with that paper? When you were, for example, helping a client, would you be reading the documentation that a client provided to you?
> A: It depends on whether it was in cursive or large-enough print for me to read.

(Johnson Depo. at 60.) Also, in addition to reading verification documents, plaintiff had to read records made by other caseworkers. He further testified:

> Q [by Ms. Newell]: Did you have any problems reading the paperwork that was coming from other workers?
> A: Sometimes. I would go to the worker and indicate to them that "will you please tell me what you're saying here."

(*Id.* at 71.)

**5.** This third factor—whether the function is highly specialized so that the incumbent is hired for his or her expertise or ability to perform the particular function—is not terribly helpful in evaluating basic, fundamental skills, such as

Based on an analysis of the above factors, the Court concludes that eliminating even a portion of the reading responsibilities, by requiring another person to read to plaintiff, would fundamentally alter the nature of the job.

b. *Filing*

The Court also finds that the elimination of filing duties would change an integral part of the job's responsibilities, especially if considered in conjunction with a reduction in the reading responsibilities. For every claimant whom a caseworker senior interviews and "processes," there is accompanying documentation that must be filed in a case record. The "Performance Appraisal Instrument" submitted by defendant shows that "organiz[ation] and maintain[ence of] information" is deemed to comprise twenty per cent (20%)—or one-fifth—of the job. (*See* Def. Mot. for Sum. J. [25] at Ex. 3.) That is, roughly one-and-a-half hours a day should be devoted to organizing and filing information, based on an eight-hour day. Plaintiff unequivocally stated in his deposition that he

simply cannot perform this duty. When asked by the defense attorney whether he needed someone to do all of the filing, he replied: "yes, yes." (Johnson Depo. at 59.)

As stated, there are a limited number of employees to whom the filing function could be allocated. Moreover, the other caseworker seniors have an even greater volume of documents that must be filed, as their caseloads have more cases assigned to them.[6] To saddle them with additional filing would impinge on their ability to maintain their own files. With regard to the third factor, again, while plaintiff was not hired for his particular expertise in filing, having the ability to file is required in order to carry out the purpose of his position.[7]

Elimination of the filing function would reduce plaintiff's duties by 20%, a significant reduction. Whether that reduction by itself would "fundamentally alter" the position, the elimination of the filing duties when considered in tandem with the reduction in the reading duties and the disruption to other

reading or filing. That is, most people with a high school diploma will be able to file or read. That these functions are not highly specialized, however, does not mean that the inability to perform them is insignificant. To the contrary, in a job such as the one at issue, where the skill of reading was the most important skill required to perform the job, the inability to read meant that the applicant could not perform the job, itself.

6. There has been some mention of a "peach worker" who, as a condition to receiving benefits, must volunteer a certain number of hours at DFACS. Plaintiff has suggested that this worker be assigned to him more frequently to assist him in reading and filing. It appears, that such a worker had assisted plaintiff with filing on some occasions, but that there was still a backlog. (See Memorandum to Marie Elder from Cecilia Jackson, Def. Ex. 4 attached to Def. Mot. for Sum. J. [25].) Moreover, plaintiff acknowledged that the worker, who was a public aid recipient, was frequently unreliable in her attendance and undependable in her work effort. *See* Johnson Depo. at 79 ("Well, the Peach Worker we had seldom would come to work ... [M]ost of the time she wasn't available ... It was just due to her work habit."). Thus, even if such a worker could be assigned on occasion to plaintiff, the assistance would be sporadic and insufficient to meet plaintiff's needs and the requirements of the position. Moreover, whether the person assisting plaintiff is a paid case worker or a conscripted public assistance recipient, plaintiff's

limitations make it necessary to fundamentally alter an essential function of the position in order for him to do his job. Neither the ADA nor the Rehabilitation Act require an employer to reassign an essential function.

7. The Court notes that there seemed to be a lack of communication between the DRS and DFACS, causing the mismatch between what the job entailed and plaintiff's capabilities. The two departments simply did not iron out all of the details before placing plaintiff in the position of caseworker senior. For example, Ms. Gail B. Moore, a Community Development Specialist who conducted the job analysis to determine if the position would be suitable for plaintiff, stated in her deposition: "I recommended [to defendant Jackson] that perhaps the filing, which [in her opinion] was a minor function of the position, be allocated or restructured to perhaps another individual and at the time of meeting with Miss Jackson she indicated that that *might be* possible." (Moore Depo. at 9 (emphasis added).) Of course, the employer did not consider that function to be minor and it is to the employer's judgment concerning the required tasks that this Court must defer. 42 U.S.C. § 12111(8).

Moreover, Ms. Moore acknowledged that job matching the "blind or visually impaired (individuals) [wa]s not [her] strong suit." (*Id.* at 23.) She, in fact, did not conduct the functional assessment of plaintiff's skills. All that she knew of his disability she had learned from him. (*Id.* at 22.)

workers by the need to take over, on an intermittent basis, these reading duties, would clearly alter in a fundamental way, the position for which plaintiff was hired to fill.

The ADA further directs: "Consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). This text makes clear that "the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards." 29 C.F.R. Pt. 1630, App. § 1630.2(n) (citation omitted).

It appears that the employer considers both functions essential to the performance of the caseworker senior position.[8] Defendant Jackson's affidavit attests to the fact that reading and filing are part and parcel of the job. Again, the Court notes that the "Performance Appraisal Instrument" places great emphasis an employee's accuracy, timeliness and ability to organize and file. (*See* Def. Mot. for Sum. J. [25] at Ex. 3.)

The Court concludes that the functions of reading and filing are essential to the caseworker senior position.[9] Having made that determination, the Court must determine whether plaintiff was qualified to perform them with or without reasonable accommodation.

### 2. Was Plaintiff's request for accommodation reasonable?

■■■ Plaintiff's request for accommodation included having another person, for example, a volunteer, read to him those forms that are written in cursive or are otherwise unreadable.[10] (Johnson Depo. at 54–55, 58, 60.) Such accommodation, however, would still leave plaintiff unable to perform the functions himself. A defendant is not required to reallocate essential functions, such as the function of reading in this case. *Reigel v. Kaiser Foundation Health Plan of N.C.*, 859 F.Supp. 963, 973 (E.D.N.C.1994) (citing *Gilbert v. Frank*, 949 F.2d 637, 644 (2d Cir. 1991); *Treadwell v. Alexander*, 707 F.2d 473, 478 (11th Cir.1983)) ("[C]ourts have universally found that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability.")[11]

As plaintiff has not shown that with reasonable accommodation *he* can perform the essential duties of a caseworker senior, the Court finds that plaintiff is not a *qualified* individual with a disability. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(*o*) at 407 (1995) (citation omitted) ("An employer ... is not required to reallocate essential functions.... For example, suppose a security guard position requires the individual who holds the job to inspect identification cards. An employer would not have to provide an individual who

---

**8.** The Court recognizes that Ms. Moore believed that filing was not a major function. (Moore Depo. at 9.) Again, however, her opinion does not warrant deference, as she is not the employer. *See* n. 7, *supra*.

**9.** With regard to the filing, even if this function were not essential, the Court would conclude that plaintiff's requested accommodation of allocating that duty to another employee or employees to be unduly burdensome, or unreasonable, for the employer. Each caseworker is required to properly maintain those records that have been entrusted to them. (*See* Jackson Aff. at ¶ 3.) The office has a limited number of caseworker seniors and a "peach worker," who is not particularly reliable.

Moreover, even if defendants had been able to accommodate plaintiff's request for filing assistance, because plaintiff cannot perform the essential function of reading a portion of the

verification forms that he is responsible for processing, he still would not be qualified for the position.

**10.** Plaintiff stated in his deposition that he knows of no device or aid that would help him to read the less legible documents or enable him to perform filing duties.

**11.** As a matter of law, an employer is not required, under the guise of a reasonable accommodation, to hire another employee to perform essential functions of the ADA plaintiff's job. The wisdom of that precept is dramatically illustrated when the employer is a public agency, with tight budgetary resources, that ministers to the poor. Using scarce and limited public funds to hire a second employee to perform part of the work of an employee who cannot fully perform his job duties diverts valuable resources away from the mission of the agency.

is legally blind with an assistant to look at the identification cards for the legally blind employee."). *See also Ricks v. Xerox, Corp.,* 877 F.Supp. 1468, 1477 (D.Kan.1995) ("[R]equiring (defendant) to hire a 'helper' to assist (plaintiff) in performing the essential functions of any position would, as a matter of law, (not) be a reasonable accommodation.")

### 3. *Impact of Initial Decision to Place Plaintiff In The Position*

■ One final point should be addressed. Plaintiff also appears to argue that, by placing him in the position of caseworker senior, the State has admitted that either he was qualified to perform the job or that any accommodations necessary to permit the functions of his job to be performed, albeit by persons other than the plaintiff, were necessarily reasonable. As a legal matter, plaintiff's argument is without merit. Plaintiff was still in his "working test" period at the time that he was terminated. As noted, during that period, the employer evaluates an employee before he obtains permanent status; prior to attainment of permanent status, the employee may be terminated for any reason. Accordingly, as with any employee, during this period, the employer was still in the process of evaluating whether plaintiff could perform the duties of his position.

Moreover, if accepted, plaintiff's argument would have the effect of discouraging an employer from ever taking a chance on a disabled employee to see if that person can actually do the job. Society, in general, and the disabled, in particular, should want an employer to feel free to give a handicapped person a try, if it seems at all likely that this person could perform the job. A policy that would require an employer to retain forever a disabled employee, merely because the employer, in hiring the individual, had miscalculated the latter's ability to perform the job is a policy that would discourage greatly any effort to give the disabled a chance.

Accordingly, the Court finds no legal merit in such an argument. Having said that, however, the present situation reveals the confusion and hurt that can result when an employer is not careful enough in assessing whether an applicant can perform a particular job. Although all the State personnel clearly acted with the best of intentions in trying to find a suitable position for plaintiff, their failure to identify more carefully, or at least to communicate to each other more precisely, just what tasks plaintiff would be required to perform—and accordingly what tasks he might not be able to perform—created the inevitable conflict between the duties plaintiff was expected to perform and those he was unable to perform, given his severe visual limitations.[12]

Plaintiff is a person who clearly wants to work and, for that commendable attitude, he commands our respect. Having a severe visual impairment, he obviously has had great difficulty finding employment and must have been very excited about the prospect of this job. He could have been spared the disappointment that was inevitable here—and the State likely could have been spared this litigation—had the State parties been more careful in their assignment of him to a particular position.

For all the above reasons, the Court holds that plaintiff's case should be dismissed as he has failed to demonstrate that defendant violated either the ADA or Section 504 of the Rehabilitation Act.

### *CONCLUSION*

For the foregoing reasons, defendant's Motion for Summary Judgment [25] is **GRANTED.**

---

**12.** *See* n. 7, *supra.* The fact that Ms. Moore characterized the filing function as "minor" highlights the diverging perspectives of the DRS and DFACS, both agencies of the state defendant.